RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SALVATORE PALMA, JR., individually and as administrator of the estate of Vincent Dominic Palma; MELISSA PALMA; ALISHA PALMA,

> *Plaintiffs-Appellants*,

*v.*

MATTHEW JOHNS, Deputy Sheriff, in his individual and official capacity as an employee of the Ashtabula County Sheriff's Department; ASHTABULA COUNTY, OHIO,

> *Defendants-Appellees*.

┐
│
│
│
│
│  No. 21-3315
>│
│
│
│
│
┘

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00294—Dan A. Polster, District Judge.

Argued: December 10, 2021

Decided and Filed: February 28, 2022

Before: MOORE, CLAY, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Richard J. Perez, PEREZ LAW, Willoughby, Ohio, for Appellants. Timothy T. Reid, MANSOUR GAVIN LPA, Cleveland, Ohio, for Appellees. **ON BRIEF:** Richard J. Perez, PEREZ LAW, Willoughby, Ohio, Leslie S. Johns, MARTINEZ LAW FIRM, Willoughby, Ohio, for Appellants. Timothy T. Reid, MANSOUR GAVIN LPA, Cleveland, Ohio, for Appellees.

CLAY, J., delivered the opinion of the court in which MOORE, J., joined. READLER, J. (pp. 32–56), delivered a separate dissenting opinion.

_____

**OPINION**

_____

CLAY, Circuit Judge.   On February 8, 2017, Defendant Deputy Matthew Johns ("Johns"), a deputy sheriff for Defendant Ashtabula County (collectively "Defendants"), shot and killed Vincent Palma ("Palma"), a mentally ill individual, while responding to a 9-1-1 call about a family dispute over a television remote.  Palma's family members ("Plaintiffs") sued Defendants under 42 U.S.C. § 1983 and various state tort laws.  The district court granted summary judgment to Defendants on all claims.  For the reasons set forth below, we **REVERSE** the district court's order granting Defendants' motion for summary judgment and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

On February 8, 2017, Johns shot and killed Palma after responding to a 9-1-1 call at the Palma home, where Palma lived with his father, Salvatore, his stepmother, Melissa, and his stepsister.  Although some facts are undisputed, each witness recounted a different version of events.  At this stage, we must view the facts in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor, *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020) (quoting *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)), and we note at the outset that we are not required to "accept the officers' subjective view of the facts," *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019).  Similarly, "credibility judgments and weighing of the evidence are prohibited." *Godawa v. Byrd*, 798 F.3d 457, 462 (6th Cir. 2015) (quoting *Schrieber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010)).

**I.  Deputy Johns' Statements**

On February 8, 2017—a cold winter day in Geneva, Ohio—Johns responded to a 9-1-1 call at the Palmas' home.  The 9-1-1 dispatcher told Johns of an "unwanted person," Vincent Palma, at the house.  Johns knew that Palma "had been unhappy with the TV show that was on TV and that he had broken the television remote."  (Matthew Johns Dep., R. 50-1, Page ID #732.)  Dispatch also told Johns that Palma was a "Code 76," meaning Palma suffered from

mental health issues. (*Id.*) Johns did not know that Palma was bipolar and schizophrenic. While en route to the Palma house, Johns saw Palma's driver license and knew that Palma was the subject of the call. Before arriving, Johns removed his weapon from his ankle holster because he anticipated that he might need it.

Johns pulled up to the house and parked his patrol car in the Palmas' driveway, about forty to fifty feet away from the house. Johns saw Palma standing outside on the porch with a hood up over his head and his hands in his pockets, which immediately "concerned" Johns. (*Id.* at Page ID ##740–41, #744.) Johns got out of his car and loudly greeted Palma before walking about ten to fifteen feet towards the house. Palma did not respond. Johns tried greeting Palma two more times, but Palma did not respond. When Johns was standing ten to fifteen feet in front of his car, and about thirty feet from where Palma was on the porch, Palma came down the porch stairs and began walking towards Johns. Johns described Palma's walk as "determined" and "aggressive." (*Id.* at Page ID #776; Johns Aff., R. 46-2, Page ID #571, #574.) But Palma "wasn't walking at a fast pace." (Johns Dep., R. 50-1, Page ID #776.)

Johns repeatedly told Palma to stop walking and to take his hands out of his pockets, but Palma did not respond and continued approaching Johns. When Palma got within twenty to twenty-five feet of Johns, Johns started backing up towards the passenger side of his patrol car. Palma's parents, who had come outside, told Palma to "Just stop" and "[d]o what [Johns] says to do." (*Id.* at Page ID #768.) Johns radioed for backup; calling a "Code 10." (*Id.* at Page ID #769, #771.) Code 10 means "intermediate" priority. (*Id.* at Page ID ##771–72.) In more serious situations, officers would call a "Code 44." (*Id.*)

After retreating backwards towards the side of his patrol car, Johns pulled out his taser. Johns warned Palma he would use his taser if Palma did not stop approaching. Palma did not stop and Johns tased him. The taser had little impact, and Palma kept walking towards Johns, so Johns tased him again. This time Palma fell to the ground and landed in a puddle on the driver's side of Johns' patrol car, near the front bumper. Palma fell onto his side with his back facing Johns. Johns told Palma to rollover and show his hands. They were six to ten feet apart at this point. Johns took a few steps towards Palma, but he stopped when Palma did not respond to commands. Johns called for backup again, asking them to "step up" their response. (*Id.* at Page

ID #797.)  As Palma got up from the ground, Johns tased him a third time.  This time Johns saw Palma use one hand to pull out the taser probes.  Johns did not see a weapon or any other object in Palma's visible hand, and he did not know where Palma's other hand was.  After Palma pulled out the probes, Johns holstered his taser.

Palma got up and started walking towards Johns, and Johns continued retreating backwards across the driveway.  Palma was still not responding to commands.  Johns then pulled out his baton.  He raised it over his head and prepared to strike Palma with it, but Johns did not use it because Palma momentarily turned away from Johns and looked back towards his parents.  A moment later, Palma turned back around and started walking towards Johns again.  Johns said that Palma had a "crazed look on his face," and that Palma's "appearance, demeanor, and behavior told [him] that [Palma] was not going to stop."  (Johns Aff., R. 46-2, Page ID #576.)  Johns kept retreating by walking backwards up a hill on the Palmas' lawn.  It was muddy, and at one point Johns' boot slipped as he backed up the hill.  After he almost fell, Johns believed that Palma's "intention was to physically reach [him], assault [him], and perhaps obtain [his] weapon."  (*Id.* at Page ID #576.)

Johns continued to tell Palma to stop and warned him that "this is how people get shot."  (Johns Dep., R. 50-1, Page ID #842.)  Palma was about six to seven feet away at this point.  Johns then unholstered his gun and pointed it at Palma while still retreating.  Palma did not stop.  After Palma took about ten more steps, Johns shot him.  Johns first shot at Palma's leg "in an attempt not to kill [Palma] but to stop him."  (*Id.* at Page ID #857.)  After the first shot, Palma continued to walk towards Johns, so Johns fired again, this time aiming for Palma's "[c]enter mass."  (*Id.* at Page ID #858.)  Johns continued shooting until, after several shots, Palma "leaned over at the waist" and got "down on the ground" in "a bear crawl stance."  (*Id.* at Page ID #859.)  While Palma was in this stance, Palma "lunge[d]" at Johns, so Johns continued shooting.  (*Id.* at Page ID #860, #863.)  Johns shot at Palma until "the moment that [Palma] no longer came towards [him]."  (*Id.* at Page ID #857.)

Throughout the entire encounter, Palma never said anything to Johns, he never reached out towards Johns, and he never verbally threatened Johns.  Palma did not raise his fists or make any threatening gestures.  But because Palma did not respond to commands, and kept walking

towards Johns, Johns believed the situation "was more than a friendly encounter." (*Id.* at Page ID #854.) Backup arrived shortly after the shooting. Johns then approached Palma and searched him. Palma was unarmed.

## II. Salvatore Palma's Statements

Salvatore Palma, Jr. ("Salvatore"), Vincent Palma's father, recounted many of the same facts. However, he remembered the taser applications differently. As Palma approached Johns, Johns was yelling "stop walking, I'll tase you." (Salvatore Palma Dep., R. 50-5, Page ID #1034.) Palma did not stop and Johns tased him from "across the hood of the car to the other side." (*Id.*) Salvatore reported seeing Palma convulsing on the ground "for minutes" after Johns tased Palma twice. (*Id.* at Page ID #1046.) Eventually, Salvatore saw Palma get up and pull the taser wires out. Palma then looked back at his father as Johns pulled out his firearm and warned Palma that he would shoot.

Palma then turned back around and continued walking towards Johns, Johns continued to retreat, and Johns repeatedly ordered Palma to stop. Johns then shot some "warning shot[s]." (*Id.* at Page ID #1038.) After those shots, Palma "didn't keep approaching. He was still standing there." (*Id.* at Page ID #1042.) Salvatore said that Palma never got within ten feet of Johns.

## III. Melissa Palma's Statements

Melissa Palma ("Melissa"), Vincent Palma's stepmother, also saw the encounter. She had called 9-1-1 that day after Palma took the remote out of his sister's hands. She told the dispatcher that she wanted Palma removed from her house and that Palma had "mental issues." (Melissa Palma Dep., R. 50-6, Page ID #1165.) Melissa testified that she told the police that Palma was unarmed. However, it is unclear when she said this and whether she shared this information with Johns before the shooting.

Melissa's written statement, on the day of the incident, generally mirrored Johns' account:

> Police came. [Palma] went downstairs to police. Police told him to stop, he kept going to police. Police said, stop, again. I'm going to taser you. [Palma] kept going after cop. Cop tased him. He fell to ground. [Palma] got up, went after cop again. Cop told him to get on ground. [Palma] would not. Cop told him he was going to shoot him, but [Palma] kept going to cop. The cop shot by his feet, but [Palma] still came after cop. Cop told him to get on ground. [Palma] did not listen, so cop shot him couple more times.

(*Id.*) But in her deposition, she said that she had misspoken in her written statement and that after Johns tased Palma, Palma got up and began walking towards the house. She only heard Johns tell Palma to stop a couple of times. Melissa also gave more detail in her deposition. She said that Palma was on the ground for two to three minutes after Johns tased him, and that, after the tasing, Palma "didn't come after the cop." (*Id.* at Page ID #1159.) Rather "when he got tased, . . . [Palma] got up and started going to the house, the officer was going towards him. [Palma] was facing the other way, going towards the house." (*Id.* at Page ID #1174.)

At some point after the taser, but before Johns shot Palma, Palma was "walking towards the end of the road." (*Id.* at Page ID #1170.) She said that Palma stopped walking whenever Johns stopped, and neither Johns nor Palma was moving when Johns shot at Palma's feet. Johns and Palma were ten to fifteen feet apart at that time. The encounter lasted around eight to ten minutes.

## IV. Other Evidence

The dispatcher's records give their own timeline. They show that Johns arrived on the scene at 3:36 P.M. Johns requested backup—radioing a Code 10—at 3:39 P.M. Johns reported shooting Palma just eighteen seconds later. Within two and a half minutes after arriving on the scene, Johns shot Palma. But Johns testified that these times, which are entered by the dispatcher in real time as Johns calls them in, are "often delayed," meaning that the time entered does not always reflect the time of the officer's report. (Johns Dep., R. 50-1, Page ID #832.)

The record also contained forensic evidence about Palma's gunshot wounds. Johns fired twelve shots. Nine of the bullets hit Palma: one in his head, one in his shoulder, two in his chest, one in his abdomen, two in his arms, and two in his legs. According to the autopsy report, four bullets entered Palma's body at a "downward" angle. (Autopsy Rep., R. 50-3, Page ID

##947–50.)  Two entered from "back to front."  (*Id.* at Page ID #947.)  Plaintiffs' expert, relying on the autopsy, concluded that Palma "was either on the ground, possibly in a fetal position and/or on his hands/knees and/or crawling when he was shot by Dep[uty] Johns."  (Expert Rep., R. 50-2, Page ID #932.)

## V.  Procedural Background

Plaintiffs, family members of Vincent Palma, sued Deputy Johns and Ashtabula County for damages under 42 U.S.C. § 1983 and various Ohio tort laws.  Plaintiffs sued Johns in his individual capacity under § 1983 alleging that Johns violated Palma's constitutional rights by using excessive force, and they brought a claim under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978), against Ashtabula County for failure to supervise and train Johns.  Plaintiffs also brought state tort claims.  Defendants filed a motion for summary judgment on all claims, which the district court granted.  *Palma v. Johns*, No. 18-cv-294, 2021 WL 798405, at *1 (N.D. Ohio Mar. 2, 2021).  The district court found that Johns acted reasonably, that Johns did not violate Palma's Fourth Amendment right to be free from excessive force, and therefore Johns was entitled to qualified immunity.  *Id.* at *4.  Without a constitutional violation, the district court rejected Plaintiffs' *Monell* claim because "Plaintiffs cannot rely on Johns' conduct to establish a claim of municipal liability against Ashtabula County."  *Id.* at *5.  The court further found that qualified immunity barred Plaintiffs' state law claims.  *Id.* at *4–*5.  Plaintiffs timely appealed.  On appeal, Plaintiffs raise one issue:  whether Johns acted reasonably when he shot and killed Palma.  This single issued was the basis for the district court's dismissal of all of Plaintiffs' claims.

DISCUSSION

## I.  Standard of Review

We review *de novo* a district court's decision granting summary judgment on qualified immunity grounds.  *Burgess*, 735 F.3d at 471 (citing *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012)).  A court may grant summary judgment if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is a genuine dispute of material fact when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbell Cnty.*, 915 F.3d 1087, 1093 (6th Cir. 2019). When considering a motion for summary judgment, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Wright*, 962 F.3d at 864 (quoting *Burgess*, 735 F.3d at 471). "[A]t the summary judgment stage the judge's function is not . . . to reweigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## II. Analysis

Johns claims that the doctrine of qualified immunity shields Defendants against all of Plaintiffs' claims. The district court agreed and granted Defendants' motion for summary judgment. *Palma*, 2021 WL 798405, at *3–*5. We disagree. The record contains genuine disputes of material fact that preclude summary judgment at this stage.

While the defendant "bears the burden of pleading" a qualified immunity defense, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002)). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rafferty*, 915 F.3d at 1093 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity is intended to protect public officials from unnecessary interference with their duties, while also holding them accountable 'when they exercise power irresponsibly.'" *Godawa*, 798 F.3d at 462 (quoting *Pearson*, 555 U.S. at 231).

We "ask two questions in evaluating whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: '(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident.'" *Estate of Hill*, 853 F.3d at 312 (quoting *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016)).

## A. Constitutional Violation

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers." *Godawa*, 798 F.3d at 463 (citing *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014)). When determining whether an officer used excessive force, courts ask whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting them.'" *Estate of Hill*, 853 F.3d at 312 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This test must account for the "totality of the circumstances" surrounding the officer's use of force. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 480 (6th Cir. 2017) (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 387, 404 (6th Cir. 2007)). In applying this test, courts look "only to the facts that were knowable to the defendant officer[]." *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)). The question is not only "whether any force was justified," but also whether Johns "could reasonably use the degree of force employed against" Palma. *Roell*, 870 F.3d at 483 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)).

The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And we recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396–97). "But just because we must look at the circumstances through the eyes of a reasonable officer does not mean . . . that we must accept the officers' subjective view of the facts when making this assessment." *Jacobs*, 915 F.3d at 1041. Rather, "the action must be viewed in light of the surrounding circumstances." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

When considering the "totality of the circumstances," the Supreme Court has articulated three factors as a starting point: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Estate of Hill*, 853 F.3d at 313 (quoting

*Graham*, 490 U.S. at 396). This list is not exhaustive. *Roell*, 870 F.3d at 480 (quoting *Livermore*, 476 F.3d at 404). However, the *Graham* factors do not easily map onto cases like this one, where Johns was not responding to an ongoing crime and Palma never physically resisted arrest or tried to flee. *See Jacobs*, 915 F.3d at 1040; *Estate of Hill*, 853 F.3d at 314. Recognizing this problem, we have articulated additional factors to consider when officers respond to a medical or mental health emergency: (1) whether the person was experiencing a mental health or medical emergency, and whether that emergency created "an immediate threat of serious harm" to themselves or others; (2) whether "some degree of force [was] reasonably necessary to ameliorate the immediate threat;" and (3) whether "the force used [was] more than reasonably necessary under the circumstances." *Estate of Hill*, 853 F.3d at 314. Like the *Graham* factors, this list is not exhaustive "and not necessarily dispositive in every case." *Id.* (citing *Livermore*, 476 F.3d at 404). Rather, these factors merely guide courts as they consider the "totality of the circumstances" to determine whether the officer's use of force was objectively reasonable. *See Jacobs*, 915 F.3d at 1040–41 (quoting *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017)).

Where "a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Wright*, 962 F.3d at 865 (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017)). Here, Plaintiffs claim that Johns used excessive force in three ways: (1) by tasing Palma three times,[1] (2) by taking initial shots at Palma, and (3) by

---

[1]Defendants argue that Plaintiffs waived this claim by failing to raise it in their opposition to summary judgment. The dissent agrees. While it is true that Plaintiffs' opposition to summary judgment did not address their claim that Johns' use of the taser was excessive, the real problem is that Defendants did not identify this claim in their motion for summary judgment. Plaintiffs' Amended Complaint expressly stated that "Defendant, Matthew Johns' use of the taser was [an] unjustified and reckless use of force." (Am. Compl., R. 23, Page ID #133.) Although moving for summary judgment on all of Plaintiffs' claims, Defendants ignored this portion of the complaint and only argued against Plaintiffs' excessive *lethal* force claim. Unsurprisingly, Plaintiffs used their opposition brief to address only those claims that Defendants identified and argued in their motion for summary judgment—thus Plaintiffs also focused on the use of lethal force.

Generally, at the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the *moving party's arguments*. *See Doughty v. Dep't of Developmental Servs. STS*, 607 F. App'x 97, 98 (6th Cir. 2015) (citing *United States v. Litwok*, 678 F.3d 208, 216 (2d Cir. 2012)). But the non-moving party cannot be faulted for limiting their response to focus on those claims that the *moving party* raised and argued. While explaining the fundamental justifications for our forfeiture rules, we have highlighted that response and reply briefs are meant to do just that: *respond* and *reply*. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)

continuing to shoot Palma even after Palma bent over with his hands on the ground. After viewing the facts in the light most favorable to Palma, if "a jury could conclude that [the defendant] engaged in gratuitous violence by using force beyond the scope of that which was reasonably necessary or justifiable," then the defendant is not entitled to qualified immunity at the summary judgment stage. *Margeson v. White Cnty.*, 579 F. App'x 466, 471 (6th Cir. 2014) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010)).

### 1. Taser Applications

Officers may use non-lethal force—such as tasers or pepper spray—if they have an "objective justification" for doing so. *Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004). Specifically, officers may use a taser if a person is "particularly violent or physically resistant, so as to endanger responders." *Estate of Erwin v. Greene Cnty.*, 861 F. App'x 1, 6 (6th Cir. 2021) (citing *Kent*, 810 F.3d at 391). Johns argues that tasing Palma was reasonable because Palma "was actively resisting at every turn" by failing to comply with Johns' orders to stop and show his hands. (Defs.' Br. at 20.)

Indeed, officers may tase a person who actively resists arrest, *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012)), or who "resist[s] . . . an officer's commands even if the officers were not attempting to arrest him," *Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016). Resistance includes "physically struggling with, threatening, or disobeying officers." *Id.* (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). But not all disobedience justifies the use of force. "[A]n officer may not tase a citizen not under arrest merely for failure to follow the officer's orders when the officer has no reasonable fear for his or her safety." *Wright*, 962 F.3d at 868–69. Thus, Johns could not have tased Palma merely for refusing to stop and

---

(quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). Thus, Plaintiffs were under no obligation to support their claim that use of the taser was excessive when Defendants did not identify this claim or raise any arguments against this claim in their motion for summary judgment.

Even so, recognizing that the complaint clearly stated an excessive force claim based on the tasings, the district court addressed this claim and concluded that all three taser applications were reasonable. *Palma*, 2021 WL 798405, at *3 (citing *Sheffey v. City of Covington*, 564 F. App'x 783, 796 (6th Cir. 2014)). Thus, while Defendants failed to raise the issue in their summary judgment motion, we will consider whether Johns used excessive force when he tased Palma because this claim was pled in the complaint, the district court decided the issue, and both parties briefed it on appeal.

show his hands unless he had some other reason to fear for his safety. *See Rudlaff*, 791 F.3d at 642 (reasonable to tase man who was "verbally defiant," "swung his arms in the officer's direction," and "refused to give [the officer] his hands").

Palma never physically resisted. However, the parties agree that Palma ignored Johns' orders to stop moving and take his hands out of his pockets. Even so, this defiance, alone, cannot justify Johns' decision to tase Palma. *See Wright*, 962 F.3d at 868–69. If the jury accepts Johns' version of events—that Palma "aggressively" approached him with a "crazed look on his face," (Johns Aff., R. 46-2, Page ID #576, #582)—then the taser applications may have been reasonable. At the summary judgment stage, however, we do not blindly "accept the officers' subjective view of the facts." *Jacobs*, 915 F.3d at 1041. As discussed below in relation to the shootings, viewing the facts in the light most favorable to Plaintiffs, Palma's mere failure to follow orders would not lead a reasonable officer to believe that Palma posed a danger. *See Wright*, 962 F.3d at 868–69.

Moreover, Plaintiffs dispute key facts about the tasing. Salvatore said that Johns and Palma were separated by Johns' patrol car and that Johns "tased [Palma] across the hood of the car to the other side." (S. Palma Dep., R. 50-5, Page ID #1034.) This conflicts with Johns' narrative that Palma was walking straight towards him in a way that was immediately threatening. In this situation, tasing Palma while he and Johns were separated by a physical barrier would be unreasonable.

Other evidence contradicts Johns' reports that the taser was ineffective on Palma, thus undermining the reasonableness of Johns' decision to tase Palma multiple times. Palma fell to the ground after the second taser application. Salvatore saw Palma convulsing on the ground "for minutes" after Johns tased Palma the second time. (*Id.* at Page ID #1046.) Melissa similarly saw Palma on the ground for two to three minutes after Johns tased him. If Palma fell to the ground for several minutes after the second tasing, then Johns could not justify the third taser application, as he had ample time to reassess the situation and react with less force. *See Gambrel v. Knox Cnty.*, — F.4th —, No. 20-6027, 2022 WL 369348, at *9 (6th Cir. Feb. 8, 2022) (continued use of force unreasonable if the person is on the ground for an extended period

of time during which officers "could have handcuffed him at any time while he remained on the ground").

The parties also dispute where Palma was in relation to Johns and what Palma was doing when Johns applied the taser for the third time. In her deposition, Melissa testified that Palma stood up after the second taser application and "started going back to the house." (M. Palma Dep., R. 50-6, Page ID #1157.) She said that Palma was not walking towards Johns. Admittedly, Melissa gave a different statement to officers on the scene immediately after the shooting, where she said that Palma stood up after the second taser and again began approaching Johns. Relying *solely* on Melissa's on-the-scene written statement (and ignoring her deposition testimony), the dissent concludes that the third taser application was reasonable because Palma was walking towards Johns even after the first and second taser applications. The dissent goes as far as questioning Melissa's credibility, highlighting that her deposition testimony was given only "after retaining counsel and filing a civil damages suit against Officer Johns." (*Infra* Dissent at 37.) But whether one statement is more reliable than another is a credibility question that is not for this Court to decide. *See Godawa*, 798 F.3d at 463 (quoting *Schrieber*, 596 F.3d at 333). Indeed, this Court recently refused to wade into a similar credibility issue at the summary judgement stage. *See Gambrel*, — F.4th —, 2022 WL 369348, at *7. In *Gambrel*, the plaintiff's star witness gave two statements that recounted starkly different versions of events—one that he gave in an initial police interview and one that he gave during his deposition. *See id.* at *6–*7. However, "[w]hen witnesses tell differing stories . . . we cannot credit the story of the witness that we find more believable." *Id.* at *7 (citing *Anderson*, 477 U.S. at 255). "[S]imply because [the plaintiff] might find it difficult to convince a jury to believe [a witness] does not allow us to ignore [that witness's] testimony now." *Id.* (citing 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2725.2, at 440 (4th ed. 2016)).

In her deposition, Melissa explained that her on-the-scene statement was wrong. The police took Melissa and Salvatore's written statements shortly after the shooting while the bullet-ridden Palma was still laying in the yard. As Melissa explained, she was just "trying to leave" when she gave her on-the-scene statement. (M. Palma Dep., R. 50-6, Page ID #1157.) After unjustifiably opining on the reliability of Melissa's different statements, the dissent chooses to

ignore portions of her deposition testimony.  It finds that, based solely on Melissa's written on-the-scene statement, this material fact—whether Palma was approaching Johns when Johns applied the taser for the third time—is undisputed.  This approach is antithetical to our summary judgment standard; courts cannot choose which statements are credible and then build an "undisputed" record based on those credibility determinations.  *See Gambrel*, — F.4th —, 2022 WL 369348, at *7 (explicitly rejecting the approach taken by the dissent here).

Accepting the facts most favorable to Plaintiffs, the tasings amounted to excessive force, and Defendants were not entitled to summary judgment on this issue.

2. Shootings

"A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  When an officer uses *deadly* force, that force is unreasonable unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.*  "[T]he threat factor is 'a minimum requirement for the use of deadly force.'" *Jacobs*, 915 F.3d at 1040 (quoting *Mullins*, 805 F.3d at 766).  "We have authorized the use of deadly force 'only in rare instances.'" *Id.* (quoting *Sample*, 409 F.3d at 697).

When considering whether an officer reasonably believed that a person posed an imminent threat of serious bodily harm, courts must consider the totality of the circumstances.  Here, certain factual considerations are particularly relevant, though none is dispositive and this list is not exhaustive:  (1) why the officer was called to the scene, *see Graham*, 490 U.S. at 396; (2) whether the officer knew or reasonably believed that the person was armed, *see Bouggess v. Mattingly*, 482 F.3d 886, 891 n.5 (6th Cir. 2007) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1051–62 (6th Cir. 1996)); (3) whether the person verbally or physically threatened the officer or disobeyed the officer, *see Wright*, 962 F.3d at 868 (quoting *Smith*, 874 F.3d at 945); (4) how far the officer was from the person, *see Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010); (5) the duration of the entire encounter, *see Untalan v. City of Lorain*, 430 F.3d 312, 316 (6th Cir. 2005); (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer, *see Roell*, 870 F.3d at 482; and

(7) whether the officer could have diffused the situation with less forceful tactics, *see Thomas*, 854 F.3d at 366–67. After weighing these factors, we conclude that Defendants cannot prevail at the summary judgment stage because a reasonable jury could find that Johns used excessive force when he first shot at Palma. *See Anderson*, 477 U.S. at 248.

### a. Reason for Police Response

When officers respond to an ongoing crime, or set out to arrest a suspect, they may have some reason to fear for their safety or the safety of others based on the nature of the crime. *See Graham*, 490 U.S. at 396 (courts must consider "the severity of the crime at issue"). But Johns was not responding to a past or ongoing crime. When officers are called for wellness checks or other non-criminal calls, this Court looks at what the officer learned and observed about the situation before the officer even engaged with anyone on the scene. *Compare Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (factor did not support use of lethal force when nobody accused the person of threatening or violent behavior before police arrived), *with Simmonds*, 682 F.3d at 444–446 (factor supported use of lethal force when officers responded to call about a drunk and possibly suicidal man who was threatening to kill his ex-girlfriend's family and officers knew the man owned guns).

Although Johns seemingly believed that he was walking into a volatile situation—indeed he unholstered his gun even before arriving on the scene—this subjective belief was not factually supported. Johns responded to a call about an unwanted person on the Palma property who had gotten into a fight with his sister over the TV remote.[2] Johns was not responding to a crime. Before arriving, Johns saw Palma's driver's license and knew that Palma was the unwanted person. When he arrived, Johns saw Palma standing outside of the house by himself. Even if Johns believed that removing an unwanted person may involve some inherent danger, the unwanted person—Palma—was already isolated and away from the home. Thus, the facts do not support Johns' belief that he was walking into a high-risk situation. This factor therefore cuts against Johns' argument that Palma posed an imminent threat of serious physical harm. *See Woodcock*, 679 F. App'x at 423.

---

[2]While Defendants describe Palma's prior mental health hospitalizations and run-ins with police, none of these facts were known to Johns and are thus irrelevant here. *See Simmonds*, 682 F.3d at 445.

b. *Presence of a Weapon*

"[A]n officer need not face the business end of a gun to use deadly force." *Jacobs*, 915 F.3d at 1040 (citing *Thomas*, 854 F.3d at 366). The stronger the evidence showing that a person is armed, the more likely the use of lethal force is reasonable. *See Bouggess*, 482 F.3d at 891 n.5 (citing *Dickerson*, 101 F.3d at 1051–62). When the evidence is weak, this factor cannot justify the use of lethal force. *See id.* On the one hand, officers are often justified in shooting a person who is visibly armed and aiming at officers. *See DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006). However, even if a person is visibly armed, lethal force may *still* be unreasonable. *E.g.*, *Thomas*, 854 F.3d at 366 ("To be clear, we do not hold that an officer may shoot a suspect merely because he has a gun in his hand."). Although an officer may reasonably believe that a person was armed even if it turns out that the person was, in fact, unarmed, the officer's belief must have been reasonable based on the circumstances. *See id.* at 365. For example, in *Simmonds*, 682 F.3d at 445, we found that officers reasonably used lethal force when responding to a 9-1-1 call about a man threatening to kill his family because, even though the man was, in fact, unarmed, the caller said that the man owned guns, the man threatened officers saying "I have a gun," and the man brandished a "silver object" that he pointed at officers.

Nobody told Johns that Palma was armed. Melissa allegedly told Johns that Palma was *unarmed*—though the record does not indicate whether she said this before or after the shooting. Dispatch did not tell Johns that Palma might be armed or was threatening to use a weapon, even though dispatch otherwise gave Johns several details about the scene at the Palma house—a sibling dispute over a TV remote control and a mentally ill person on the premises. While these facts do not require the conclusion that Johns knew Palma was unarmed, a jury could reasonably infer that, had there been any reason to believe Palma was armed at the time, the 9-1-1 caller would have disclosed this fact and that dispatch would have shared this information.

Once on the scene, Johns admits that he never saw Palma holding any object, let alone a firearm or other weapon. As it turned out, Palma was unarmed. But Johns may not have known this, and, at the time, Johns was "concerned" that he could not see Palma's hands. (Johns Dep., R. 50-1, Page ID #744.) Our decision in *Woodcock* is instructive here. 679 F. App'x 419.

In that case, the officers responded to the scene after a man, Harrison, called 9-1-1 and said that he wanted to kill his brother. *Id.* at 420. The officers found Harrison standing on a railroad track with his left hand reaching into the rear waistband of his pants. *Id.* at 421. Officers repeatedly told Harrison to show his hands, but he did not acknowledge or comply with the order. *Id.* After warning Harrison that they would shoot, Harrison still refused to comply, and officers shot him. *Id.* We found that this disobedience and suspicious hand placement did not give the officers probable cause to believe that Harrison posed an imminent threat because, while the officers "may have thought that Harrison had a gun, . . . Harrison never gave [the officers] reason to think that he would use it imminently." *Id.* at 424–25. Like the officers in *Woodcock*, Johns' only reason to suspect that Palma may have been armed was that he had his hands in his pockets and refused to show them.

The fact that Johns could not see Palma's hands would not lead a reasonable officer to believe he was in imminent danger. *See id.* As we explained in *Woodcock*, even if the person's hands are not visible—and even if he appears to be suspiciously reaching for something in his clothing—these facts would not lead a reasonable officer to believe that the person posed an immediate threat of serious harm. *Id.*; *see also Graves v. Malone*, 810 F. App'x 414, 417, 422–23 (6th Cir. 2020) (unreasonable to shoot man who initially refused to show his hands even after he suddenly raised his fist while holding a small black object); *Bouggess*, 482 F.3d at 891 n.5 (officer's "mere hunch that [the person] had a firearm cannot be enough to meet his burden" (citing *Dickerson*, 101 F.3d at 1051–62)). There are equally plausible, but far more innocent explanations for Palma's behavior. For one, it was early February in northern Ohio; as Johns admits, "[i]t was cold." (Johns Dep., R. 50-1, Page ID #738.) Moreover, Johns saw at least one of Palma's hands when Palma pulled out the taser probes, well before Johns decided to shoot. Johns did not see a weapon or any other object in Palma's hand. Thus, this factor does not support Johns' qualified immunity defense.

### c. Disobedience and Threatening Behavior

When a person does not act "aggressive[ly]" towards an officer, that fact undermines the officer's claim that the person presented an immediate threat of serious bodily harm. *Stewart v. City of Euclid*, 970 F.3d 667, 673–74 (6th Cir. 2020). Additionally, "the mere failure of a

citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to put the citizen in handcuffs," let alone to *use lethal force* against him. *Wright*, 962 F.3d at 868 (quoting *Smith*, 874 F.3d at 945).

Many undisputed facts show that Palma was not acting aggressively towards Johns. Johns admits that Palma "wasn't walking at a fast pace" when Palma approached him. (Johns Dep., R. 50-1, Page ID #776.)  Palma was silent throughout the entire encounter, and he never verbally threatened Johns.  Nor did Palma ever make any physically threatening gestures, like raising his fists.

On the other hand, the parties agree that Palma walked towards Johns at different points during the encounter and agree that Palma refused to comply with several orders to stop and show his hands.  Although Johns says that Palma walked toward him in an "aggressive" and "determined" fashion, (*id.*; Johns Aff., R. 46-2, Page ID #571, #574), Palma's parents never characterized Palma's walk in this way.  If there were ironclad evidence controverting the Palmas' version of the facts, perhaps we could accept Johns' characterization of Palma's walk as aggressive.  *See Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017) (granting summary judgment only because dashcam footage undisputedly showed suspect aggressively charging at the officer after crashing his car during a high-speed car chase).  But because we lack the undisputed dashcam footage that uncontrovertibly established the sequence of events in *Mitchell*, for the purpose of deciding a summary judgment motion, we must believe the Palmas' characterization of the events of the day.  The dissent incorrectly believes that *Mitchell* should decide this case.  The suspect in *Mitchell*, however, presented an objectively greater risk of harm. After leading officers on a high-speed car chase through residential neighborhoods, the suspect exited the car and "began to charge" at the officer "at more than a walking pace."  *Mitchell*, 864 F.3d at 421–22.  And, as the suspect charged at the officer, he shouted that the officer would "have to 'f---ing shoot him.'"  *Id.* at 422.  Even if this case were on point, the Court in *Mitchell* noted that its only basis for affirming summary judgment was the dashcam footage that showed "most of the relevant events from a helpful angle."  *Id.* at 424.  Had the "case turned on [the officer's] after-the-fact testimony," rather than the video footage, then "summary judgment would likely have been inappropriate."  *Id.*

Moreover, as *Mitchell* itself made clear, deadly force is not justified "whenever a suspect charges at an officer or defies an order." *Id.* In the instant case, a jury could reject Johns' characterizations and conclude that Palma's walk was neither aggressive nor threatening. *See Jacobs*, 915 F.3d at 1041 (we do not have to "accept the officers' subjective view of the facts" on summary judgment). And even Johns admitted that Palma "wasn't walking at a fast pace." (Johns Dep., R. 50-1, Page ID #776.) Recognizing this problem, Johns contends that "the way that one describes how [Palma] was walking or advancing at Johns is immaterial." (Defs.' Br. at 17.) Simply stated, according to Johns, merely walking towards an officer while defying orders gives the officer probable cause to fear for his safety and justifies the use of deadly force. We have expressly rejected this argument. *See Mitchell*, 864 F.3d at 424.

Johns also says that Palma was walking towards him when he first shot Palma, but Melissa saw Johns shoot at Palma while both Palma and Johns were stopped. Even if Palma *were* walking when Johns shot, this would not necessarily give Johns probable cause to believe Palma posed an imminent threat. *See id.* And if Palma *was not* walking towards Johns when Johns fired the first shots, as we must accept at this stage, then this factor shows that Palma did not pose an imminent threat at the moment Johns decided to shoot.

### d.  Distance Between the Officer and the Person

While the distance between the officer and the person is less significant when the person is armed and aiming a firearm at the officers, *see DeMerrell*, 206 F. App'x at 429, the distance is relevant when the officer is afraid of a hand-to-hand confrontation with the person, *see Zulock*, 441 F. App'x at 302 (likely unreasonable to shoot man armed with a knife when officers were eighteen to twenty feet away); *Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (reasonable to shoot man who approached officer and got within five feet while wielding a knife).

Johns said he was concerned that Palma would "physically reach him, assault him, and perhaps obtain [his] weapon." (Johns Aff., R. 46-2, Page ID #576.) According to Johns, Palma got within six or seven feet of Johns. But, according to Melissa, Palma never got close enough to reach Johns. She said that Palma and Johns were always ten to fifteen feet apart. If Palma

was ten to fifteen feet away from Johns, and was not moving when Johns shot him, then Palma did not pose an imminent threat of harm, especially because Johns never saw a weapon.

### e. Duration of the Encounter

"The fact that a situation 'unfolds quickly' is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness when it accompanies a credible threat to the safety of an officer or the public." *Mitchell*, 864 F.3d at 423 (citing *Mullins*, 805 F.3d at 766–67). The record in this case does not clearly show how long Johns was on the scene before he shot Palma. Dispatch records indicate that only two-and-a-half minutes passed between the time Johns arrived at the Palma house, a few seconds before 3:37 P.M., and the time he reported shooting Palma just after 3:39 P.M. However, Johns admitted that the arrival time recorded by dispatch "is often delayed," (Johns Dep., R. 50-1, Page ID #832), meaning the dispatcher's timeline could be wrong. In contrast, Salvatore indicated that the incident lasted much longer because Palma was on the ground for several minutes after Johns tased Palma. And Melissa said the entire encounter lasted eight to ten minutes.

If the incident lasted eight to ten minutes, then the amount of time Johns had to react to Palma would not justify his use of lethal force. *See Untalan*, 430 F.3d at 316 (indicating that deadly force is less reasonable when officers have ten minutes to assess and react to a situation). Admittedly, officers often face rapidly evolving situations where they must make "split-second judgment[s]." *Graham*, 490 U.S. at 396. However, nothing in the record indicates that Johns had to make a split-second decision in response to rapidly changing circumstances. If Palma steadily approached Johns at a normal walking speed—and Johns continued to back away—for eight to ten minutes, then there was no *immediate* threat. *See Kirby v. Duva*, 530 F.3d 475, 482–83 (6th Cir. 2008). Whether Johns shot Palma several minutes after he called for backup or only eighteen seconds later, the alleged threat that Palma presented remained the same.[3] If Johns had

---

[3]To be clear, even if Johns shot Palma eighteen seconds after he called for backup, that short amount of time would not automatically justify his use of force as a split-second judgment. Lethal force may have been justified only if the encounter lasted eighteen seconds *and* if the undisputed facts suggested that Palma's behavior constituted a threat at that time.

eight to ten minutes to assess and respond to a situation that never rapidly escalated, the use of lethal force would be unreasonable.  *See id.* at 483.

### f. Mental Health Conditions

When assessing an excessive force claim, "[t]he totality of the circumstances includes 'the fact that at the time of the . . . struggle, the defendant officers had reason to believe that [the person] was . . . mentally unstable.'"  *Roell*, 870 F.3d at 482 (quoting *Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008)).  While true that this factor is only relevant if Johns knew about Palma's mental illness, *see Simmonds*, 682 F.3d at 445, the district court erroneously found that "the dispatcher did not advise Johns of [Palma]'s serious mental condition," *Palma*, 2021 WL 798405, at *3.  In fact, the dispatcher specifically told Johns that Palma was a "Code 76"— meaning Palma suffered from mental health issues.  (Johns Dep., R. 50-1, Page ID #732, #823.) Johns was "therefore required to take into account [Palma]'s diminished capacity before using force" against him.  *Roell*, 870 F.3d at 482 (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004)).

As Johns correctly point outs, an officer is not absolutely barred from using lethal force on mentally ill individuals.  *See Reich*, 945 F.3d at 979.  But only in extreme cases have we found that an officer reasonably used lethal force against a mentally ill person.  In every case that Johns cites, the officers used lethal force against a mentally ill person who was *armed* and *threatening* officers.  *See Gaddis*, 364 F.3d at 772–73, 776–77 (reasonable to shoot mentally ill man who attacked police officers with a knife and stabbed an officer before officers shot him); *Rucinski*, 655 F. App'x at 339–42 (reasonable to shoot schizophrenic man who pulled a switchblade on officers, yelled "bring it on" or "here we go," and began walking towards officers with the knife in hand); *see also Summerland v. Cnty. of Livingston*, 240 F. App'x 70, 72, 77 (6th Cir. 2007) (reasonable to shoot mentally ill man who posted a sign in his yard saying, "no police you be shot" and charged at officers with either an axe or a gun).  The district court pointed to one other unpublished district court opinion, *see Palma*, 2021 WL 798405, at *4, but even that case involved a mentally ill man who "charged at [the officers] with a knife," *Johnson v. Combs*, No. 04-cv-19, 2005 WL 2388247, at *5 (W.D. Ky. Sept. 27, 2005).

Johns knew that Palma was a "Code 76," meaning he was mentally ill, and he knew that he was responding to a domestic dispute over a remote control. (Johns Dep., R. 50-1, Page ID #823.) A reasonable officer would take these facts into account when assessing whether Palma posed a threat. If a person who is not suffering from mental illness acts in a way that is objectively threatening, an officer may believe that the person poses an imminent danger because their actions—under normal circumstances—convey hostility towards the officer. But if the officer knows that person is suffering from some mental illness, the officer must consider this fact and respond accordingly. *See Gambrel*, — F.4th —, 2022 WL 369348, at *9 (citing *Studdard v. Shelby Cnty.*, 934 F.3d 478, 480–82 (6th Cir. 2019)). Stated differently, behavior that ordinarily seems threatening may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition. *See generally Graves*, 810 F. App'x at 417, 423 (lethal shooting unreasonable even when mentally ill man ignored officers' commands and continued "staring vacantly ahead"). Here, Palma's unresponsiveness was consistent with his mental illness, thus undermining Johns' belief that it was threatening. This is especially true because Palma was silent and made no physically threatening gestures.

The dissent agrees that officers can and should consider a person's mental state when analyzing the amount of risk that they face. But the dissent says that this factor will *always* support the use of force. It believes that people with known mental illnesses inherently "pose[] a *heightened* risk," therefore giving officers probable cause to believe that they face a risk of imminent harm, and goes as far as to say that the use of force, including lethal force, is more easily justified even if officers are merely conducting a wellness check because "a mentally ill individual in the midst of a psychotic break will not respond to reason, or to anything other than force." (*Infra* Dissent at 43 (emphasis in original) (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1043 (9th Cir. 2018) (Bea, J., dissenting in part)).)

But police routinely respond to non-criminal mental health calls and wellness checks. *See* Black's Law Dictionary, *What is a Police Welfare Check?*, available at https://thelawdictionary.org/article/what-is-a-police-welfare-check/. Accordingly, under this Court's precedent, officers should use their training and expertise in crisis management to determine whether and how to de-escalate a situation before resorting to force. *See Martin*,

712 F.3d at 958–59 (denying qualified immunity because a reasonable officer "would try to de-escalate the situation and reduce the level of force needed to gain control"). Officers must use this experience to assess the level of risk *in light of* a person's mental illness. We are not saying, as the dissent suggests, that officers may never use force against mentally ill persons. We have recognized many cases finding reasonable uses of force against mentally ill persons. *See Reich*, 945 F.3d at 979. In reality, mental illness may mitigate the risk in one situation and aggravate the risk in another. Therefore, we cannot simply defer to an officer's *post hoc* use of mental illness as a justification for using force. Rather, if a jury could find that a reasonable officer would not perceive an imminent threat of danger—or would use other de-escalation tactics—then qualified immunity is unwarranted. *See Martin*, 712 F.3d at 958–59; *Johnson v. City of Philadelphia*, 837 F.3d 343, 353 (3d Cir. 2016). Based on the undisputed facts that Johns knew Palma was mentally ill and that Palma was unresponsive but not threatening throughout the entire encounter, mental illness *in this case* was a mitigating factor showing that Palma did not pose an immediate threat. *See Graves*, 810 F. App'x at 417, 423.

Furthermore, Palma's mental illness is relevant when considering whether Johns used *excessive* force. "The diminished capacity of an unarmed [person] must be taken into account when assessing *the amount of force exerted*." *Roell*, 870 F.3d at 482 (quoting *Champion*, 380 F.3d at 904) (emphasis added). While we have found that using a taser or pepper spray on a mentally ill person was reasonable, *see id.* (likely not excessive to repeatedly tase a man suffering from a psychotic break after he "aggressive[ly]" approached officers with a garden hose and physically resisted arrest); *Estate of Erwin*, 861 F. App'x at 5 (reasonable to tase a mentally ill women who yelled at officers to leave and approached them while holding a rake above her head), we have never held that *shooting* a mentally ill person was reasonable when the officers had little reason to suspect that the person was armed.[4] A jury is best positioned to balance these considerations.

---

[4]Only twice have we said it was reasonable to shoot a mentally ill person who turned out to be unarmed. In both instances, however, officers had ample reason to believe that the suspect was armed with either a gun or an explosive device. Thus, these cases are more akin to those involving lethal force against a visibly armed mentally ill person. First, in *Beans v. City of Massilon*, 706 F. App'x 295, 301 (6th Cir. 2017), we held that officers reasonably used lethal force in a hostage situation when officers raided the crime scene and found the mentally ill suspect trying to "ignite [a] lighter and cause an explosion." Though perhaps not armed in the traditional sense, this case is more

### g. *Readily Available Alternatives*

Plaintiffs argue that "Johns failed to use readily available alternatives to avoid the encounter with [Palma] and avoid shooting and killing him." (Pls.' Br. at 8.) Specifically, they argue that Johns had the opportunity to use less than lethal force—his baton—and that Johns could have easily removed himself from the situation. Generally, an officer is not precluded from using deadly force even if his own "poor planning or bad tactics" unnecessarily escalated the situation. *Reich*, 945 F.3d at 978 (citing *Livermore*, 476 F.3d at 407). However, "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Thomas*, 854 F.3d at 366–67 (citing *Dickerson*, 101 F.3d at 1163); *see also Mitchell*, 864 F.3d at 423 (indicating that failure to use alternatives—if officers had the time and opportunity to use them—may render use of deadly force unreasonable); *Gaddis*, 364 F.3d at 784 (Clay, J., dissenting) (finding use of lethal force likely unreasonable when officers failed to use "tactically more appropriate" measures first). This factor is particularly important in cases involving mental health crises, where officers should use the least force necessary to subdue the person. *See Estate of Hill*, 853 F.3d at 313–14. As the Third Circuit has stated:

> Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual.

*Johnson*, 837 F.3d at 353 (citing *Martin*, 712 F.3d at 958).

When Johns arrived on the scene, the threat of the unwanted person was neither severe nor immediate. *See id.* While Johns apparently thought that he was walking into a volatile situation—so much so that he preemptively unholstered his gun while driving to the scene—this

---

akin to those involving an armed mentally ill person. Similarly, in *Simmonds*, 682 F.3d at 445, we affirmed the district court's decision finding that the officers had qualified immunity after they shot and killed a mentally ill man because officers had ample reason to believe the man was armed: he was threatening to kill his family members, his family told officers he owned multiple guns, the man shouted "I have a gun," and the man pulled out a "silver object" and pointed it towards officers. Although the man in *Simmonds* was actually unarmed, officers had every reason to believe he had a gun. *See id.*

was hardly the scene he found when he arrived.  By that time, Palma was already outside of the home and isolated from the rest of his family.

According to the dissent, the situation on the scene was so dire that any failure to intervene or await backup would have amounted to a "dereliction of duty." (*Infra* Dissent at 44.) In its view, had Johns not taken immediate action, he would have been "leaving the family to fend for themselves" against "an unwelcome intruder." (*Id.*)  This was hardly the case.  When Johns pulled into the driveway, he saw Palma standing alone on the front porch with his hood up and his hands in his pockets.  With Palma—the unwanted person—already having departed from the house, no one was in immediate danger and Johns had time to further assess the scene.  It must be remembered that the police were called to the scene only because of a family dispute over a TV remote control.  Johns should have waited for backup before engaging with a mentally ill man who posed no immediate threat to anyone.

Even after engaging with Palma, Johns still could not use force that was "grossly disproportionate to the need." *Martin*, 712 F.3d at 961 (quoting *Simpson v. Hines*, 903 F.2d 400, 401 (5th Cir. 1990)).  After tasing Palma, Johns had the opportunity to subdue him using other, non-lethal methods such as handcuffs or his baton.  Indeed, Johns pulled out his baton, extended it, and raised it above his head ready to strike Palma.  Ultimately, Johns abandoned any attempt to use the baton after Palma turned back towards Johns.  If an officer reasonably unholsters his gun during an encounter, it may be unreasonable to expect him to swap out the gun for a less lethal tool. *See Mitchell*, 864 F.3d at 423.  But the opposite happened here; Johns unholstered his gun even though a less deadly alternative was already in his hands.  Furthermore, if the entire encounter lasted eight to ten minutes, Johns may have been able to safely pursue other options such as getting into his patrol car and awaiting backup.

### h. Balancing All Factors

While each of these factual considerations is distinct, none can be considered standing alone.  Altogether, the facts, viewed in the light most favorable to Plaintiffs, raise a triable issue as to the reasonableness of Johns' decision to use lethal force.  Defendants focus primarily on Palma's disobedience; Palma purportedly kept walking towards Johns and refused to show his

hands.  But equally important is that Johns knew Palma was mentally ill; Palma did not commit any crime before Johns arrived; he did not threaten Johns; he did not make any threatening gestures, like raising his fists; and he did not visibly brandish a weapon.  Palma walked towards Johns at a normal pace—and it is the jury's job to decide whether this was "aggressive," as Johns said.  After tasing Palma, Johns saw one of Palma's hands, but still did not see any weapons.  According to Melissa, the encounter lasted eight to ten minutes and, even while approaching Johns, Palma never got within ten to fifteen feet of Johns.  Under these circumstances, Johns lacked probable cause to believe that Palma posed an imminent threat of serious bodily harm.

Defendants point to an Eleventh Circuit opinion that they believe is "directly on point." (Defs.' Br. at 27 (citing *Martinez v. City of Pembroke Pines*, 648 F. App'x 888 (11th Cir. 2016).) In *Martinez*, multiple officers responded to a mental health emergency and found the plaintiff pacing, yelling, and waving his hands around.  *Martinez*, 648 F. App'x at 889–90.  As officers tried to handcuff him, the plaintiff swung his arms around and hit an officer in the head causing him to bleed profusely.  *Id.* at 891.  The plaintiff got away from the officers but turned around and took two steps towards the officers while he was only ten to twelve feet away.  *Id.*  Officers then shot the plaintiff once before using a taser to subdue the plaintiff as officers handcuffed him.  *Id.*  The Eleventh Circuit found the shooting reasonable and affirmed summary judgment in the officers' favor.  *Id.*  But this case is not "directly on point" at all.  While officers were similarly responding to a mental health crisis, the plaintiff in *Martinez* physically resisted when officers tried to restrain him, and he seriously injured one of the officers in the process.  *See id.* at 893.  If Palma had violently resisted in this manner and injured Johns before approaching him again, this would be a different case.  But those are not the facts presented here.

In fact, we have found triable issues as to the officer's reasonableness even when officers faced more threatening situations.  For example, in *Bouggess*, we held that the officer was not entitled to summary judgment because the officer "offered only a hunch, a crack deal, a hand-to-hand struggle, and a 'look in [the person's] eyes' to support his claim that his choice to shoot [the person] . . . was reasonable under the Fourth Amendment."  482 F.3d at 892.  In *Jones v. Sandusky County*, 541 F. App'x 653, 655–56, 665–66 (6th Cir. 2013), we found a triable issue as to the officers use of deadly force when officers shot an armed suspect who had threatened to kill

his family because, just before the officers shot, they detonated a flash bang that would have made it hard to see whether the suspect was poised to use the firearm against the officers.  And in *Zulock*, 441 F. App'x at 302, we found that officers were not entitled to summary judgment on qualified immunity grounds when the officers shot a man who was armed with a kitchen knife, did not respond to the officers' orders, and repeatedly cursed at officers.  Here, viewing the facts in the light most favorable to Plaintiffs, a police officer unreasonably shot a mentally ill man who was not verbally threatening the officer, was not making any threatening movements or gestures, and gave the officer little reason to suspect that he was armed or dangerous.  Thus, Defendants were not entitled to summary judgment on this theory of excessive force.  *See Jacobs*, 915 F.3d at 1041 (quoting *O'Malley v. City of Flint*, 652 F.3d 662, 677 (6th Cir. 2011)).

    3.  <u>Continued Shooting</u>

Finally, Plaintiffs argue that, even if the tasing and initial shooting were reasonable, Johns acted unreasonably by continuing to shoot at Palma with a second volley of shots.  Once an officer eliminates the imminent threat, any continued use of force is unreasonable.  *See Dickerson*, 101 F.3d at 1162 n.9; *Margeson*, 579 F. App'x at 471–72.  Plaintiffs rely on *Margeson* to argue that shooting Palma nine times—including several shots after Palma fell to the ground—was unreasonable.  As Plaintiffs note, the number of shots fired is certainly relevant, but it is not dispositive.  *Margeson*, 579 F. App'x at 472.  In *Margeson*, the officer shot the plaintiff forty-three times in multiple volleys.  *See id.*  Based on this fact alone, "a jury could reasonably infer that [the plaintiff] became incapacitated, and was therefore unable to pose a threat after having been shot with the first few bullets."  *Id.*  A jury could make the same finding here; if Palma became incapacitated after the first round of shots, Johns had no reason to continue shooting.

The parties dispute whether Johns subdued Palma after the first few gunshots.  Johns claims that Palma "lunge[d]" at him after Palma bent forward in a "bear crawl" stance.  (Johns Dep., R. 50-1, Page ID #860, ##862–63.)  At this point Johns could clearly see both of Palma's hands.  But Salvatore disputes this description of events.  He said that, after the first shots, Palma "didn't keep approaching.  He was still standing there."  (S. Palma Dep., R. 50-5, Page ID #1042.)  Similarly, the autopsy report indicates that Palma did not get back up and move towards

Johns. Four of Palma's gunshot wounds were inflicted by bullets entering his body at a "downward" angle. (Autopsy Rep., R. 50-3, Page ID ##947–50.) And two bullets entered from "back to front." (*Id.* at Page ID #947.) Plaintiffs' expert noted that the pattern of the gunshot wounds on Palma's body indicated that "Palma was either on the ground, possibly in a fetal position and/or on his hands/knees and/or crawling when he was shot by Dep[uty] Johns." (Expert Rep., R. 50-2, Page ID #932.)[5] "These factual disputes are material because they concern the nature of any movement that [Palma] may have made just before the shooting." *Lopez v. City of Cleveland*, 625 F. App'x 742, 746 (6th Cir. 2015) (denying summary judgment when witnesses disagreed whether suspect was facing officers while holding machete over his head or whether he was facing his sister with the machete at his side when officers shot him). Taking the facts in the light most favorable to Plaintiff, Johns continued shooting even though he could now see that Palma was not holding a weapon, Palma was not moving, and Palma was bent over with his hands on the ground. In that situation, any threat Palma posed dissipated after the first few shots and that Johns acted unreasonably by continuing to shoot Palma.

## B. Clearly Established

Having found that there were constitutional violations, we turn to the second prong of the qualified immunity inquiry—whether that constitutional right was clearly established.[6] As a starting point, Palma had a clearly established right to be free from excessive force. *See Godawa*, 798 F.3d at 463. While this general right is well known, the right at issue is not defined at such "a high level of generality." *Id.* at 467 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Rather, "the clearly established law must be 'particularized.'" *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When determining

---

[5]The parties dispute whether the expert's testimony can create a genuine dispute of material fact. But even without the expert's opinion, Johns does not deny that he could now see Palma's hands and that Palma was hunched over after the first round of shots. Even considering only these undisputed facts, a jury could find that Palma no longer posed a threat and that the second round of shots was unreasonable.

[6]Because the district court found that Johns did not violate the Fourth Amendment, it did not reach this prong, *see Palma*, 2021 WL 798405, at *3–*4, and the parties have not thoroughly argued the issue on appeal beyond Plaintiffs' broad statements that Palma has a clearly established right to be free from excessive force. However, whether the law is clearly established presents a purely legal question that we need not leave to the district court to resolve. *See Gossman v. Allen*, 950 F.2d 338, 342 (6th Cir. 1991); *Cox v. Glanz*, 800 F.3d 1231, 1246 (10th Cir. 2015) ("[W]e can entertain a[n] . . . argument on the clearly-established-law prong . . . even if the argument had been forfeited in district court, because the issue involves a pure matter of law.").

whether a particular right is clearly established, courts "ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "[T]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. Applying this test, Johns violated clearly established Fourth Amendment law by tasing and shooting Palma.

First, "'the gratuitous or excessive use of a taser' violates a clearly established constitutional right." *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015) (quoting *Landis*, 297 F. App'x at 463). Indeed, for some time, the law has clearly established "the right of people who pose no safety risk to the police to be free from gratuitous violence." *Gambrel*, — F.4th —, 2022 WL 369348, at *7 (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)). "[T]his legal rule is identified at a sufficiently 'specific' level of generality to qualify as clearly established law." *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). Moreover, we have previously found tasings unreasonable when officers faced similar circumstances. *See Wright*, 962 F.3d at 867–68. As we held in *Wright*, officers violate the Fourth Amendment by tasing a man who is not under arrest, does not physically resist, and is not visibly armed, even if the man defies the officers' orders and officers cannot see his hands. *See id.* Thus, a reasonable officer would know that tasing Palma violated his clearly established constitutional rights. *See supra* Part II.A.1.

Second, "it is axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm.'" *Mullins*, 805 F.3d at 765 (quoting *Sample*, 409 F.3d at 698); *see also Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). Under our precedents, reasonable officers would know that Palma did not pose a threat of serious physical harm and, therefore, using lethal force would be unconstitutional. An officer does not have probable cause to justify deadly force just because the person's hands are in his pockets and the officer cannot see his hands. *See Woodcock*, 679 F. App'x at 423–24 (citing *Simmonds*, 682 F.3d at 445). Moreover, officers cannot shoot based on a "mere hunch" that the person might be

armed. *Bouggess*, 482 F.3d at 892. Nor may officers use lethal force merely because someone disobeys the officer's orders. *See Wright*, 962 F.3d at 868 (quoting *Smith*, 874 F.3d at 945); *Woodcock*, 679 F. App'x at 423–24. And, when responding to mental health calls, officers must take into account the person's mental status when assessing the situation. *See Gaddis*, 364 F.3d at 775 (citing *Graham*, 490 U.S. at 396); *Graves*, 810 F. App'x at 417, 423.

Further bolstering this conclusion, many of our cases have found that lethal force was unreasonable even when officers faced objectively *more* threatening circumstances. *See Jacobs*, 915 F.3d at 1041 (unreasonable to shoot a man who reached for a gun in his waistband and shouted at officers before turning away from them); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (unreasonable to shoot mentally ill and homicidal man who was armed with two knives and standing only a few feet from the officers); *Godawa*, 798 F.3d at 465–67 (unreasonable to shoot drunk driver who fled after hitting an officer with his car); *Jones*, 541 F. App'x at 655–56, 665–66 (unreasonable to shoot an armed suspect who had threatened to kill his family because officers could not see whether the suspect was poised to use the firearm); *Zulock*, 441 F. App'x at 302 (unreasonable to shoot a man who was armed with a kitchen knife, did not respond to the officers' orders, and repeatedly cursed at officers); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998) (unreasonable to shoot a man wielding butcher knives when unclear if he was on the porch with officers or inside the house when shot). Under Plaintiffs' factual account, Johns had no reason to believe that Palma "pose[d] a threat of serious physical harm." *Garner*, 471 U.S. at 11. Under the circumstances, shooting Palma violated clearly established constitutional law. *See supra* Part II.A.2.

Finally, "[w]e have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (citing *Shreve*, 453 F.3d at 687); *see Dickerson*, 101 F.3d at 1162 n.9. And we have specifically held that continuing to shoot a person who no longer presents a danger violates the Fourth Amendment. *See Russo*, 953 F.2d at 1045; *Hood v. City of Columbus*, 827 F. App'x 464, 471 (6th Cir. 2020); *Margeson*, 579 F. App'x at 472. Thus, by continuing to shoot after Palma was bent forward or on the ground, Johns violated Palma's clearly established constitutional rights. *See Margeson*, 579 F. App'x at 472; *supra* Part II.A.3.

## CONCLUSION

Plaintiffs raise genuine disputes of material fact that bear on whether Deputy Johns violated Vincent Palma's clearly established constitutional rights. Therefore, we **REVERSE** the district court's order granting Defendants' motion for summary judgment and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

CHAD A. READLER, Circuit Judge, dissenting. If one were unsure about the power a circuit court can wield, this case is a blunt example. With two circuit judges in agreement, a majority opinion can run roughshod over a well-reasoned opinion by an experienced and dispassionate district court judge. It can selectively amplify arguments barely made by the parties and can willfully resurrect others long ago abandoned. And, perhaps most striking of all, it can entirely ignore our Court's prior decisions as well as those from the Supreme Court, comforted by the knowledge that few decisions garner review beyond the appellate panel stage.

Consider the following: Although the Palmas themselves failed to argue the point, the majority opinion zealously reads into the Fourth Amendment a purportedly clearly established command that categorically prohibits police officers from using lethal force save for when an individual brandishes a weapon, is within ten feet of the officer, or physically strikes the officer. That dim view whittles down the highly fact-specific concept of probable cause to a grossly over-simplified nub and ignores myriad other ways in which a person can demonstrate significantly threatening behavior to an officer. It likewise ignores abundant precedent confirming why the district court was correct in granting qualified immunity. Even when viewed with a generous eye, the majority opinion's rule has little precedent to justify it, let alone precedent that is clearly established.

If this case represented a mine run example of jurists elevating personal views over precedent, one might forgive the consequences. But this is no mine run case. For in beating a new path in Fourth Amendment jurisprudence, the majority opinion dramatically—and dangerously—limits the ways in which officers can protect themselves during threatening encounters. By the majority opinion's logic, an officer may not act too soon, for fear of engaging in excessive force. But he also may not wait too long. For if he does, the majority opinion reasons, that proves the threat posed to the officer was not immediate, rendering the officer's actions excessive. And while the officer waits (and hopefully remains unharmed), he must attempt alternative uses of force. Unless, of course, that alternative is a taser. Yet all of

this goes out the window, we learn, if the officer knows the individual has some vague mental health issue. While the majority opinion ties its holding to the individual's mental health status, it never explains how an officer is to respond to a threatening individual believed to be suffering from mental distress, short of advising officers to hide in their cars rather than intervene in a potentially hostile situation. Instead, the majority opinion erects a seemingly insurmountable standard to justify an officer's use of force in encounters with a person suffering mental distress. Doing so effectively bars a grant of qualified immunity if the officer is generally aware an individual faces such challenges. That is not how we have previously interpreted the Fourth Amendment. Nor, for even more obvious reasons, is it reflective of a clearly established rule in our Circuit.

For the responsible officer looking to us for direction on permissible uses of force, the majority opinion offers only confusion. And, no doubt, grave trepidation. After all, save for extreme circumstances where a person seemingly is striking an officer or brandishing a weapon, the majority opinion would leave officers with an impossible dilemma, where protecting one's personal safety almost invariably leads to personal liability. That dilemma not only piles onto the already difficult task faced by law enforcement, but it also flouts background principles underlying our Fourth Amendment excessive force jurisprudence. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) ("Police officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.'" (citation omitted)); *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (noting that "guard[ing] the police from danger" is a "strong governmental interest[]" underlying Fourth Amendment jurisprudence); *Beech v. Melancon*, 465 F.2d 425, 426 (6th Cir. 1972) (McCree, J., concurring) ("[C]ourts should not second-guess police officers who, faced with making split-second decisions, reasonably and in good faith believe that their lives . . . would be endangered if they refrain from employing deadly force.").

There is one point upon which we can all agree: Vincent's shooting was a tragic episode. As a legal matter, however, Officer Johns's use of force was constitutional. And even assuming it was not, a straightforward application of qualified immunity shields Officer Johns from civil liability. I would therefore affirm the grant of summary judgment.

I.

A.  Before turning to the law on excessive force, a few words about the facts of this case. Time and again, the majority opinion cites what it describes as disputed material facts as a basis for denying qualified immunity to Officer Johns.  Sure, there are some differences between the stories given by Officer Johns and by the Palmas.  That is virtually always the case in these sorts of disputes.  But those quibbles do not stop us from taking as true the version of material events most favorable to the Palmas.

Here, a clear picture unfolds.  Vincent Palma, a 26-year-old man, got into a fight with his stepsister over the television remote.  Melissa, Vincent's stepmother, called the police and asked them to remove Vincent, indicating that he had "mental issues."  Officer Matthew Johns, a police officer for the Ashtabula County Sheriff's Department, was assigned to respond to Melissa's 911 call.  When Officer Johns arrived at the Palmas' home, he knew that "there was an unwanted subject at the residence" who "had broken the television remote" and "was 76," a code indicating the individual had unspecified "mental issues."

The relevant events unfolded against the backdrop of a cold, damp February day in Northeast Ohio.  Officer Johns parked about halfway up the driveway at the Palmas' home, approximately 60 to 70 feet from the front door.  It was clear from Officer Johns's uniform, badge, and cruiser that he was a Sherriff's Department officer.  As he exited his police cruiser, Officer Johns saw Vincent walking down the front porch steps with his sweatshirt hood pulled up and his hands in his pockets.  Officer Johns waved and called out to Vincent.  He asked Vincent, "Hey, how are you doing?  Hey, how is it going?"  Vincent did not respond.  Instead, he walked toward Officer Johns's police cruiser.  As Vincent approached the cruiser, Officer Johns walked around to the front of the vehicle.  He called out to Vincent several times, saying "Hey, how is it going."  Vincent did not respond.

Officer Johns instructed Vincent to stop and show his hands.  Vincent did not comply. Instead, he continued to walk toward Officer Johns silently, his hands in his pockets.  At this point, Officer Johns began to retreat, walking backward toward the passenger side of his cruiser while repeating his orders to Vincent to stop and show his hands.  Vincent ignored those

instructions and continued to walk toward the cruiser. Officer Johns warned Vincent that if he did not stop, Officer Johns would tase him. Ignoring that warning, Vincent, in the words of his father, Salvatore, "kept coming at the officer." Melissa described the situation in a similar vein: Vincent continued "going after" Officer Johns. At that point, Melissa and Salvatore, standing at a distance on their front porch, yelled at Vincent to stop. But he did not respond. Nor did he obey. So Officer Johns deployed his taser, launching the probes at Vincent from across the cruiser's front hood.

The first taser application did not stop Vincent. He remained standing and, in Salvatore's words, "kept coming at" Officer Johns. Officer Johns applied the taser for a second time. Vincent fell to the ground on his side, facing away from Officer Johns. Vincent's hands were not visible. While Vincent lay on the ground, Officer Johns ordered him "to roll onto his stomach and show [Officer Johns] his hands." Again, Vincent did not comply. Instead, he stood up and, according to the Palmas, "continued towards" and "went after [Officer Johns] again." Officer Johns applied the taser a third time. Vincent took one hand out of his pocket, grabbed the taser wire and probes, and pulled them out of his skin. Vincent paused for a moment, and then, in Melissa's words, "kept going to" Officer Johns, who walked backward, away from his cruiser and up a muddy hill, while ordering Vincent to stop.

Officer Johns unholstered his firearm. He warned Vincent that if he did not stop, Officer Johns would shoot. Just as before, Vincent did not comply with Officer Johns's commands. Officer Johns fired into the ground near Vincent's feet. In the seconds that followed, there is a question of whether Vincent stood still. But all agree that he did not move away or show his hands. So Officer Johns aimed at Vincent's "center mass" and fired several times. Vincent "leaned over at the waist," with his hands and feet on the ground. When Vincent, according to Salvatore, "tr[ied] to get back up," Officer Johns continued to shoot, hitting Vincent a total of nine times, until Vincent stopped coming toward him. From the time Officer Johns arrived at the Palmas' home until the final shot, Vincent remained silent.

B. All of this reveals very little in terms of disputed fact and, in truth, offers a record ripe for a grant of summary judgment. But the majority opinion has other ideas. It laces its recitation of the facts with purportedly disputed material issues, seemingly to draw into question the

district court's assessment of the case. But some of these issues are not disputed, some are immaterial, and some are neither disputed nor material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Take, for example, the facts surrounding Officer Johns's use of the taser. There is no dispute as to whether the men were separated by the front hood of the car. And any dispute would be immaterial because even from the other side of the cruiser's front hood, Officer Johns's safety was at risk, with Vincent able to reach Officer Johns in a matter of seconds. *See Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (noting that whether a person was "separated" from officers is only relevant if the barrier posed an impediment to the person reaching the officer); *Reich v. City of Elizabethtown*, 945 F.3d 968, 981–82 (6th Cir. 2019) ("An assailant can close [a 25 to 36 foot] distance in a second or two."). As to the effectiveness of the first taser application, it is undisputed that Vincent continued to walk toward Officer Johns after that application. Further, all agree that Vincent fell and lay on the ground for several minutes after the second application. And it is undisputed that after the second application of the taser, Vincent stood up and, in the words of Melissa, "went after [Officer Johns]" again. Only then did Officer Johns apply the taser a third time. Here, the majority opinion attempts to manufacture a conflict between Melissa's deposition testimony and her at-the-scene statement, reading into the deposition testimony what is plainly not there: a statement that Officer Johns tased Vincent as Vincent was walking toward the Palmas' home. Doing so ignores Melissa's deposition statement that Officer Johns did not tase Vincent after he stood up.

Nor is it a material consideration that Officer Johns described Vincent's walk as "aggressive" and "determined" while Salvatore and Melissa, who remained on the front porch looking at Vincent's back, "never characterized [it] in this way." *Supra*, at 18. Generally speaking, the adjectives used to describe a person walking toward an officer are immaterial to the reasonableness analysis. *See Chappell*, 585 F.3d at 911 ("[T]he semantic difference between 'charging' and 'moving quickly toward' is immaterial."). And even accepting the Palmas' coloring of the events, it is undisputed that Vincent refused to obey Officer Johns's commands to stop and show his hands, and that he continued to pursue Officer Johns up a hill and across the

Palmas' front yard after being tased three times, after being warned that Officer Johns would shoot, and after being shot.

Whether Vincent was walking toward Officer Johns when he shot Vincent is also immaterial. The Palmas stated immediately after the incident that Vincent was walking toward Officer Johns but later testified—after retaining counsel and filing a civil damages suit against Officer Johns—that Vincent paused after Officer Johns fired toward his feet. Accepting the Palmas' revised description of events, any pause by Vincent is immaterial to the reasonableness analysis. *See Reich*, 945 F.3d at 979–80 ("But even including [the plaintiff's] view that [the decedent]" turned around and took several steps away from the officers, "the officers' conduct was still objectively reasonable . . . ."). Whether Officer Johns and Vincent were six feet apart, as Officer Johns said, or ten to 15 feet apart, according to Melissa, is likewise immaterial. After all, "[a]n assailant can close [a 25 to 36 foot] distance in a second or two," and we do not require a person to be within a "strike zone" to render the officer's use of force reasonable. *See id.* at 982. And whether the entire duration of the encounter was "pretty short" in Officer Johns's words, or eight to ten minutes as Melissa claims, is irrelevant as well. Our inquiry into the reasonableness of the force used "focus[es] on the 'split-second judgments' made immediately before the officer used allegedly excessive force" and does not discount those split-second judgments if they result from an escalating series of events. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (citation omitted).

Finally, there is no dispute that Vincent tried to stand up and move toward Officer Johns after being shot. In an attempt to muddy the water, the majority opinion highlights Salvatore's statement that Vincent "didn't keep approaching. He was still standing there." *Supra*, at 27. But Salvatore made that statement in response to a question about Vincent's actions after Officer Johns fired toward the ground (not, as the majority opinion suggests, after Officer Johns shot Vincent). Ultimately, whether we label Vincent's actions as a "lunge" or more simply as an attempt to stand up and move toward Officer Johns is immaterial. *See Chappell*, 585 F.3d at 911. To the same end, the autopsy's and expert reports' indication that some of the bullets were fired at a downward angle matches the parties' statements that Officer Johns shot at Vincent as he attempted to get up.

At bottom, the crucial and undisputed facts are these:  Officer Johns, having been notified of a domestic disturbance by someone with unspecified mental health issues, arrived at the scene, found an individual who repeatedly refused to obey commands and kept walking toward the officer, refusing to remove his hands from his pockets.  Having applied the taser multiple times to try to stop Vincent from advancing, and with the distance between them closing, Officer Johns finally resorted to lethal force.

## II.

With this understanding of the undisputed factual background in mind, the indisputable conclusion is that Officer Johns's uses of force were reasonable, and thus constitutional under the Fourth Amendment, as the district court concluded.  *See Graham v. Connor*, 490 U.S. 386, 394–97 (1989).

A.  I begin with the lone issue raised by the Palmas in the district court:  Officer Johns's decision to fire his gun at Vincent.  The Fourth Amendment prohibits only *unreasonable* seizures.  U.S. CONST. amend. IV.  With that standard in mind, we evaluate Officer Johns's use of lethal force by asking, based on the totality of the circumstances, whether Officer Johns had "probable cause to believe the suspect present[ed] an immediate threat of serious physical harm to the officer or others."  *Studdard v. Shelby County*, 934 F.3d 478, 481 (6th Cir. 2019) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

1.  These events are much like those we encountered in *Mitchell v. Schlabach*, where we affirmed summary judgment on the basis of qualified immunity.  864 F.3d 416, 423 (6th Cir. 2017).  There, like here, Mitchell walked toward the officer as the officer backed away.  The officer ordered Mitchell to stop and pointed his gun at Mitchell.  *Id.* at 419, 421–22.  The distance between the officer and Mitchell was at most 21 feet (farther than that between Vincent and Officer Johns), and, based on video footage, we concluded that whatever the precise distance between the two was, Mitchell could close the gap in a matter of seconds.  *Id.* at 423 & n.2.  Mitchell, like Vincent, continued "toward [the officer]" after he was shot, justifying the second shot.  *Id.* at 422.  And the officer, like Officer Johns, stopped shooting once Mitchell stopped trying to continue after the officer.  *Id.*

The majority opinion and I agree that *Mitchell* (which, again, affirmed a grant of qualified immunity) is controlling authority. That consensus should make affirming here a straightforward matter. Not so for the majority opinion, which somehow reads *Mitchell* as requiring us to *deny* qualified immunity to Officer Johns. That is an odd conclusion when one considers that *Mitchell* deemed the officer's use of force there not excessive. *Id.* at 423, 426. True, *Mitchell* acknowledged that it did "not stand for the proposition that deadly force is reasonable or proper whenever a suspect charges an officer or defies an order." *Id.* at 424. But such force was reasonable on the facts presented there, facts that largely mirror today's case. And attempting to distinguish today's case from *Mitchell* on the grounds that this case "turn[s] on [Officer Johns's] after-the-fact testimony" is but one more attempt to ignore the obvious: we can easily affirm summary judgment on the Palmas' descriptions of the encounter alone. *Supra*, at 18 (quoting *Mitchell*, 864 F.3d at 424). Yes, some of the facts in *Mitchell* paint Mitchell as the relatively greater threat. But some facts suggest just the opposite. The point is that *Mitchell* is the best parallel to today's case. Yet the outcomes are not.

2. So how can the majority opinion reach a contrary conclusion here? In part by shifting the burden of proof. Time and again, the majority opinion faults Officer Johns for failing to show that he reasonably believed Vincent posed an imminent threat of serious physical harm. *See supra*, at 15 ("This factor therefore cuts against [Officer] Johns'[s] argument that Palma posed an imminent threat of serious physical harm."); *supra*, at 17 ("Thus, this factor does not support [Officer] Johns'[s] qualified immunity defense."); *supra*, at 19 ("[A]ccording to [Officer] Johns, merely walking towards an officer while defying orders gives the officer probable cause to fear for his safety and justifies the use of deadly force. We have expressly rejected this argument."); *supra*, at 23 ("[W]e have never held that *shooting* a mentally ill person was reasonable when the officers had little reason to suspect that the person was armed."). And it is quick to point to factual differences between this case and those cited by Officer Johns (while forgiving the Palmas for the same failing). *See supra*, at 21 ("In every case that [Officer] Johns cites, the officers used lethal force against a mentally ill person who was *armed* and *threatening* officers."); *supra*, at 26 (describing a case Officer Johns cites to as "not directly on point at all" (internal quotation marks omitted). The majority opinion's approach, however, is contrary to controlling authority placing the burden on the Palmas to show a clearly established

constitutional violation. *See Williams v. Maurer*, 9 F.4th 416, 430–31 (6th Cir. 2021) ("[W]hen a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that [the] facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right."). As one might expect, Officer Johns urges us to affirm the grant of summary judgment by demonstrating why his acts were *reasonable*. But as a legal matter, the spotlight is on the Palmas to prove that Officer Johns's use of lethal force was *unreasonable*, a burden they cannot carry.

3. Having improperly shifted the burden of proof, the majority opinion then compounds that error by evaluating Officer Johns's conduct against the backdrop of a moving legal target. It proposes three legal standards. One proffered framework is the *Estate of Hill* factors. That framework, however, is mentioned once, and then never raised again, much less applied to the facts of this case. Another is the traditional *Graham* three-factor approach, which, after being introduced by the majority opinion, likewise goes by the wayside. Ultimately, the majority opinion settles on a framework consisting of seven other "factors" of its choosing, all of which the majority opinion believes weigh in favor of the Palmas. But why or how those factors relate to each other is left unsaid. To the extent a cited case addressed one of the majority opinion's factors, it did not concern the others. Analyzing each factor in a silo ignores the "totality of the circumstances" that confronted Officer Johns, a point the majority opinion concedes. *Garner*, 471 U.S. at 8–9; *see supra*, at 25 ("[N]one [of the factors] can be considered standing alone."). Yet the majority opinion spends 11 pages doing just that. And contrast that with the single paragraph, unadorned by authority, where the majority opinion concludes that these factors, taken together, prove that "[Officer] Johns lacked probable cause to believe that Palma posed an imminent threat of serious bodily harm." *Supra*, at 26.

a. In truth, the cases cited by the majority opinion rejected virtually all seven of its factors as grounds for denying an officer qualified immunity. Starting with the first of those seven factors, the majority opinion emphasizes that Vincent committed no crime on the day he confronted Officer Johns. An individual's commission of a crime, of course, is not a prerequisite to finding probable cause that he posed a threat to the officer. *See Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000) (holding that whether the individual committed a crime prior to the use

of force was "wholly immaterial to the issue of whether [the individual] presented a threat to [the] officers"). But more to the point, that fact is largely irrelevant in light of the reality that Melissa called the police and asked them to remove Vincent because he had fought with his stepsister and refused to leave the Palmas' home, giving Officer Johns reason to believe Vincent posed a threat. *See Simmonds v. Genesee County*, 682 F.3d 438, 441, 444–46 (6th Cir. 2012) (holding that officers' use of lethal force was reasonable where the decedent had not committed a crime because the decedent posed a threat of serious harm to the officers). Recasting this threatening scene as merely "a wellness check" only confirms the lengths the majority opinion will go to achieve today's result. *Supra*, at 15.

b. The majority opinion next notes that Vincent was unarmed. For two reasons, that fact fails to establish that Officer Johns acted unreasonably. First, Officer Johns did not know that Vincent was unarmed at the time, and we do not use "the 20/20 vision of hindsight" to judge an officer's use of force. *Graham*, 490 U.S. at 396; *see also Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015) ("That [the decedent] was actually unarmed . . . is beside the point; what matters is the reasonableness of the officers' belief as they 'did not and could not have known' otherwise." (citation omitted)); *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) ("The fact that [the decedent] was actually unarmed when he was shot is irrelevant to the reasonableness inquiry."). And second, Officer Johns confronted plenty of other facts at the scene that established Vincent posed a threat. Those facts include that Vincent, given his proximity to Officer Johns, could "attack[] . . . with his fists" or "wrestle for control of [Officer Johns's] gun so that he could use it against [Officer Johns]." *Mitchell*, 864 F.3d at 423. And they include that Officer Johns could reasonably believe that Vincent's refusal to follow orders to take his hands out of his pockets meant that he possessed a weapon. *See Lemmon v. City of Akron*, 768 F. App'x 410, 415 (6th Cir. 2019); *Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017).

c. The at most 15-foot distance between Vincent and Officer Johns at the time of the shooting also does not render Officer Johns's use of force unreasonable. That is true both because "[a]n assailant can close [a 25 to 36 foot] distance in a second or two," and because there is no required minimum distance for lethal force to be justified. *Reich*, 945 F.3d at 982.

d. The amount of time between Officer Johns's arrival and the shooting is irrelevant. *See Livermore*, 476 F.3d at 407; *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004). The majority opinion's focus on the time Officer Johns arrived until the time of the shooting seems to assume nothing occurred in the interim to justify the use of force, *see supra*, at 20–21 (citing *Kirby v. Duva*, 530 F.3d 475, 482–83 (6th Cir. 2008); *Untalan v. City of Lorain*, 430 F.3d 312, 316 (6th Cir. 2005) (discussing *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992))), and ignores cases (like this one) where the threat to the officer escalates.

e. With respect to Vincent's mental health status, the same excessive force standard applies regardless of his mental condition. *See Roell v. Hamilton County*, 870 F.3d 471, 482 (6th Cir. 2017) ("[T]he fact that [a person's] resistance was probably caused by his excited delirium did not preclude the deputies from using a reasonable amount of force to bring him under control." (citation omitted)); *Reich*, 945 F.3d at 979; *Rucinski v. County of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016). Contrary to the legal picture the majority opinion paints, the Constitution contains no categorical rule requiring an officer to deescalate a situation merely because he knows the person has an unspecified mental health issue. Especially when, as here, doing so jeopardizes the officer's safety.

With a singular focus on a one-off line in *Roell*, the majority opinion reads into the Fourth Amendment a rule that Officer Johns lacked probable cause to believe Vincent posed a serious threat to him because Officer Johns failed to "take into account" Vincent's mental health status. *Supra*, at 21 (citing *Roell*, 870 F.3d at 482). Yet *Roell* affirmed a grant of qualified immunity for officers who used force against a person with a known mental health condition who "presented an immediate threat" to the safety of the officers and others. 870 F.3d at 481–82, 486–87. To be sure, where a person with a known mental illness poses no threat to an officer, it is difficult to imagine how that individual justifiably could be subjected to lethal force. *See, e.g.*, *Graves v. Malone*, 810 F. App'x 414, 422–23 (6th Cir. 2020) (holding use of lethal force was unreasonable against a man with a mental illness who was sitting stationary in a bathtub with his legs dangling over the side of the tub). By the same token, when a person does pose a threat to an officer, the officer's use of force is reasonable, irrespective of the person's

mental health status.  *See supra*, at 21 (citing *Rucinski*, 655 F. App'x 338; *Summerland v. County of Livingston*, 240 F. App'x 70 (6th Cir. 2007); *Gaddis*, 364 F.3d 763).

Equally unconvincing is the majority opinion's assertion that Vincent's "unresponsiveness was consistent with his mental illness," thus requiring Officer Johns to react differently.  *Supra*, at 22.  As a threshold matter, unresponsiveness suggests an individual who will not obey commands, which, to my mind, raises the threat level, not lowers it.  At the very least, when assessing the threat posed to an officer, those who cannot obey an officer are functionally equivalent to those who will not.  Yet even taking the majority opinion on its own terms, it cites no medical or legal authority to support its assertion; this bare conclusion amounts to little more than an uninformed medical diagnosis from two jurists.  Federal judges have many attributes, but mental health expertise, it is fair to say, is unlikely to be one of them.  The same goes for police officers.  Without medical degrees, officers rely on their training and experience in reacting to each situation as it arises, assessing whether a person poses a serious threat to the officers' personal safety based on the totality of the circumstances.  We should not undermine that judgment with arm-chair mental health assessments.

One final point on the issue of mental health deserves emphasis.  The majority opinion characterizes Vincent's mental health status as a kind of mitigating circumstance, one that required a heightened standard of probable cause before Officer Johns could use lethal force.  Of course, the majority opinion fails to back the point with supporting case law.  And whatever standard the majority opinion would impose on Officer Johns, that does not change the fact that a reasonable officer in Officer Johns's position could have fairly believed that Vincent's mental health issue meant that Vincent posed a *heightened* risk.  Those who suffer from mental illness may well behave more unpredictably than those who do not.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1043 (9th Cir. 2018) (Bea, J., dissenting in part) ("The danger to the officer is not lessened with the realization that the person who is trying to kill him is mentally ill.  Indeed, it may be increased, as in some circumstances a mentally ill individual in the midst of a psychotic break will not respond to reason, or to anything other than force.").

f.  Nor can the Palmas survive summary judgment solely by showing that Officer Johns could have used non-lethal force to avoid shooting Vincent.  As precedent makes clear, the

existence of alternative measures does not render an officer's use of force unreasonable. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015) (holding that a plaintiff does not "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided" (citation omitted)); *Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020) ("To be sure, showing a potential gentler alternative [use of force] is not enough (by itself) to make a use of force unreasonable."). Particularly alarming is the majority opinion's suggestion that because Vincent was "standing alone on the front porch" "no one was in immediate danger" and, therefore, Officer Johns should have taken shelter in "his patrol car and await[ed] backup." *Supra*, at 25. Imagine a police officer who, upon arriving at the home of a family facing an unwelcome intruder, determines with one glance that the suspect, at that moment, is not actively harming anyone, and thus hides in his vehicle, leaving the family to fend for themselves until backup arrives. Unsurprisingly, we have never required officers to desert those they serve to protect. *Stewart v. City of Euclid*, 970 F.3d 667, 673 (6th Cir. 2020) (noting that police officers "hav[e] no duty to retreat" from danger). Not only is that dereliction of duty below the public's expectation of law enforcement, but doing so seemingly would subject the officer to tort liability under our precedent. *See Wilson v. Gregory*, 3 F.4th 844, 853–54, 862 (6th Cir. 2021) (denying state law immunity to officer who left the home of a suicidal man and sat in his police cruiser while the man committed suicide in his home). And it boggles the mind to see the majority opinion conclude that Officer Johns's use of lethal force was unreasonable because he could have used non-lethal force when, only pages earlier, the same opinion denied summary judgment to Officer Johns as to his use of non-lethal force. No matter what level of force Officer Johns used, it appears, the majority opinion would deem it unjustified.

g. The majority opinion repeatedly emphasizes what *did not* happen in this case rather than what *did*. For instance, the majority opinion highlights cases where we found the use of force to be reasonable, and granted either qualified immunity or summary judgment for the officer, because the officer in question faced more threatening circumstances than those present here. *See supra*, at 15–16, 23–24 n.4 (citing *Simmonds*, 682 F.3d 438); *supra*, at 18–19 (citing *Mitchell*, 864 F.3d 416); *supra*, at 19, 21 (citing *Rucinski*, 655 F. App'x 338); *supra*, at 20 (citing *Untalan*, 430 F.3d 312); *supra*, at 21 (citing *Summerland*, 240 F. App'x 70; *Gaddis*, 364 F.3d 763); *supra*, at 23 (citing *Est. of Erwin ex rel. Erwin v. Greene County*, 861 F. App'x 1 (6th Cir.

2021); *Roell*, 870 F.3d 471); *supra*, at 23–24 n.4 (citing *Beans v. City of Massillon*, 706 F. App'x 295 (6th Cir. 2017)); *supra*, at 26 (citing *Martinez v. City of Pembroke Pines*, 648 F. App'x 888 (11th Cir. 2016) (per curiam)). But that can be done in nearly every case (save for the most dire and ominous instance). Yet "the mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015). In other words, that Vincent could have acted in a *more* threatening manner does not prove that he was not threatening *enough* to justify Officer Johns's use of force.

No more convincing is the majority opinion's invocation of three opinions from the other end of the legal spectrum, that is, cases where we denied qualified immunity in supposedly "more threatening situations." *Supra*, at 26–27. Those cases make for poor analogies. In two of them, the person (unlike Vincent) was walking away from the officer at the time of the shooting. *Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010); *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007). And in the third, the officers woke the decedent immediately before shooting him. *Jones v. Sandusky County*, 541 F. App'x 653, 664–65 (6th Cir. 2013).

4. Finally, the majority opinion would consider the last shots Officer Johns fired—when Vincent was trying to stand up and continue after Officer Johns—as a separate use of force from the shots fired when Vincent was still standing. This approach turns the objective reasonableness analysis—where "each search or seizure that is alleged to be unconstitutional" is "separately" considered, *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017)—on its head, transforming a federal court's analysis into a hyper-segmented approach that incorrectly dissects the encounter second-by-second, *see Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (considering 15 gunshots as a single use of force); *Mullins*, 805 F.3d at 768 (considering multiple gunshots as a single use of force for purposes of qualified immunity analysis because the "second shot did not come at a time after which a reasonable officer would think the threat had passed"). Even accepting this framing, however, does not change the conclusion that Officer Johns used reasonable force. The fact remains that Vincent, despite having already been shot, was still trying to reach Officer Johns, giving him reason to believe that Vincent continued to pose a serious threat of physical harm. *See Plumhoff*, 572 U.S. at 777 ("[I]f police officers are

justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

5.  All things considered, the majority opinion simply "substitut[es] [its] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). Nowhere is this more evident than in the majority opinion's assessment, from its perch on the bench, years after the incident at hand, that "[Officer] Johns should have waited for backup." *Supra*, at 25. This approach tramples our decades old understanding that it is not "appropriate for us, in the quietude of our chambers, to second-guess . . . [an officer's] on-the-scene judgment." *United States v. Bradshaw*, 102 F.3d 204, 212 n.19 (6th Cir. 1996); *see also Smith*, 954 F.2d at 347 ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."). Accordingly, we should affirm the grant of summary judgment to Officer Johns.

B.  Much the same is true as to the Palmas' assertion that Officer Johns engaged in excessive force by tasing Vincent.

1.  Consider first that the Palmas did not make that argument in the district court at summary judgment. Confirming as much, counsel conceded its forfeiture during oral argument in this Court. Oral Argument at 03:16–03:30, *Palma v. Ashtabula County*, No. 21-3315 (Dec. 10, 2021), https://www.opn.ca6.uscourts.gov/internet/court_audio/aud1.php ("We didn't argue that the force was excessive at [summary judgment] on the taser."). The Palmas took the same concessionary approach in their reply brief in this Court by failing to respond to Officer Johns's recognition of the Palmas' forfeiture in the district court. All of this should end the matter. *See Greco v. Livingston County*, 774 F.3d 1061, 1064 (6th Cir. 2014) ("[T]he forfeiture rule . . . tells us to correct errors raised and addressed below, not to entertain new claims raised for the first time on appeal."); *Armstrong v. City of Melvindale*, 432 F.3d 695, 699–700 (6th Cir. 2006) ("Although both parties briefed *this* court on the issue, the failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." (emphasis in original)).

But why be troubled by the Palmas' Triple Crown of concessions? Not when this appeal, the majority opinion appears to believe, is the "exceptional case[]" where forfeiture should be excused. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (citation omitted). Truth be told, there is nothing exceptional about the circumstances of the Palmas' forfeiture. Far from it, in fact. The Palmas' taser claim presents a classic example of forfeiture: the Palmas' claim before the district court was premised on a single argument (Officer Johns's use of lethal force was unreasonable); the district court rejected that argument and granted summary judgment for Officer Johns; and then the Palmas, on appeal, raised "a better case fashioned after [the] district court's unfavorable order"—that Officer Johns's use of the taser was unreasonable. *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) (citation omitted) (finding forfeiture when the trial court rejected the plaintiff's argument that evidence was admissible and the plaintiff raised a different argument in support of admissibility on appeal).

Nothing in the majority opinion justifies a different outcome. The majority opinion provides three reasons to forgive forfeiture: the amended complaint referenced the use of force from tasing, the district court addressed tasing, and the parties briefed the issue on appeal. But similar grounds have not convinced thoughtful judges to overlook our forfeiture doctrine in previous cases. *See Scottsdale*, 513 F.3d at 551–54 (holding that an argument was forfeited due to a party's failure to raise it in its summary judgment motion even when the district court discussed the issue in its amended order, and the parties addressed it in their appellate briefs). And none of the individual reasons stand up to scrutiny. What the majority opinion describes as the district court "address[ing]" Vincent's tasing was, truth be told, a mere passing reference, likely because the Palmas did not argue that the tasing was excessive force. And, by definition, forfeiture arises in every case where the parties brief the issue on appeal but failed to present it to the district court. *See Greco*, 774 F.3d at 1064.

Nor is the Palmas' amended complaint a basis for forgiving forfeiture. For starters, it did not in fact allege that Officer Johns's use of the taser was excessive force; at most, it offered a general observation, one unconnected to their excessive force claim, that Officer Johns's "use of the taser was unjustified and reckless use of force." True, the Palmas' amended complaint does

raise Officer Johns's use of non-deadly force as to their state law assault and battery claim. But as to their federal § 1983 claim, the amended complaint is silent.

Transforming a bare assertion into a second legal theory, and then holding that the newly crafted theory survives summary judgment, as does the majority opinion, has us playing the roles of both advocate and adjudicator, something we understandably are loath to do. *See McCalvin v. Yukins*, 444 F.3d 713, 723 (6th Cir. 2006) (Cole, J., dissenting) (noting that when a party fails to raise an argument in its opening brief, "it is not this court's place, as a neutral adjudicatory body, to search the record for grounds upon which" to resolve a case). And even if, charitably read, the Palmas' complaint did make the claim that the majority opinion ascribes to it, we should still deem the argument forfeited due to the Palmas' failure to raise it in opposition to Officer Johns's motion for summary judgment. After all, as every Civil Procedure professor and student well knows, a party at summary judgment "may not rest upon the mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 248 (citation omitted); *see also Warf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013) ("To defeat a motion for summary judgment a plaintiff 'can no longer rely on the conclusory allegations of its complaint.'" (citation omitted)).

Equally unavailing is the majority opinion's contention that defendants did not move for summary judgment on the tasing claim. That assertion is difficult to square with the language in defendants' motion for summary judgment where they asked the district court to "grant summary judgment to Defendants in this matter, and dismiss this action." It is also hard to reconcile with the district court's assessment, which viewed the motion as dispositive; after granting the motion, the district court "terminated and dismissed [the case]." If, as the majority opinion seems to suggest, defendants' motion only sought partial summary judgment, we would lack jurisdiction to hear the Palmas' appeal. After all, ordinarily a "district court's order granting *partial* summary judgment does not amount to a final decision." *Trayling v. St. Joseph Cnty. Emp. Chapter of Local 2955*, 751 F.3d 425, 426 (6th Cir. 2014) (emphasis in original). Because defendants moved for summary judgment, the Palmas were "'required to come forward with every legal theory' on which [they] relied." *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citation omitted). By failing to do so, the Palmas did not preserve the tasing claim for appeal. *Id.*

2.  If preserved, the Palmas' excessive force argument nonetheless fails.  To determine if an officer's conduct violated the Fourth Amendment's prohibition on unreasonable force, we ask "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019).  In answering that question, we may consider several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396).

As already discussed, the undisputed facts reveal that Officer Johns reasonably believed Vincent posed an immediate threat to his safety.  Vincent, whose fight with his stepsister led his parents to ask law enforcement to remove him from their home, was, in the words of Melissa, "going after" Officer Johns, walking silently toward him with his hands in his pockets and ignoring Officer Johns's repeated orders to stop and show his hands as well as Officer Johns's warning that he would tase Vincent.  Only then did Officer Johns deploy and apply the taser—"a reasonable response to a threat of immediate harm when a suspect disobeys police orders and may be armed." *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 610 (6th Cir. 2020).  When the first application did not stop Vincent, Officer Johns applied the taser a second time.  Vincent fell to the ground, but he later disobeyed Officer Johns's order to roll onto his stomach and show his hands, and instead stood up and "went after [Officer Johns] again."  Officer Johns applied the taser a third time.  Each application was appropriate under the circumstances. *See id.* at 611 (holding that when multiple taser "discharges failed to immobilize [the person]," it was "reasonable for officers to believe [the person] was 'out of control,'" justifying subsequent taser applications (citation omitted)).

This was not, in other words, a "mere failure to follow orders," as the majority opinion describes the encounter. *Supra*, at 12.  That view turns a blind eye to other aspects of the confrontation.  Vincent's disobedience also included walking silently toward Officer Johns with his hands in his pockets.  And the order Vincent disobeyed was to stop the behavior that gave Officer Johns reason to believe Vincent posed a threat.  Though absent from the majority opinion, the first taser application did not stop Vincent from walking toward Officer Johns, and after being tased for the second time, Vincent stood up and, as Melissa said, "went after [Officer

Johns] again." Vincent's conduct easily distinguishes this case from *Wright v. City of Euclid* and *Gambrel v. Knox County*, cases on which the majority opinion relies in its attempt to show why Officer Johns's use of the taser was unreasonable. In *Wright*, unlike here, the officer tased a person who had complied with the officer's orders to turn off his car and put his hands up, yet was unable to comply with the officer's order to exit the car because of his medical issues. 962 F.3d 852, 866–67 (6th Cir. 2020). And in *Grambrel,* the decedent was lying on the ground and not fighting back as he was "brutally beaten" by two officers. — F.4th —, No. 20-6027, 2022 WL 369348, at *9 (6th Cir. Feb. 8, 2022).

## III.

Assuming, for purposes of argument, that the Palmas' claims satisfy the first step of qualified immunity, they wildly fail the second. Step two's legal framework is familiar. "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citation omitted). To prove that Vincent's right in this instance was clearly established, the Palmas bear the burden to either "identify a case that put [Officer Johns] on notice that his specific conduct was unlawful" or show that the case is an "obvious" one, such that the generalized Fourth Amendment standards set forth in *Graham* and *Garner* "'clearly establish' the answer, even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (citation omitted). In other words, a plaintiff faces a fork in the road: present controlling, on-point contemporaneous case law, or show that the violated right was obvious.

Yet standing at that fork, the Palmas proceeded down neither path. Officer Johns's assertion of qualified immunity obligated the Palmas to explain why Officer Johns's conduct—either the tasing or the shooting—violated clearly established law. *See Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) ("A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity.") On appeal, however, they left those questions largely unanswered. Here again, the Palmas' litigating decisions should spell the end of the case.

Enter the majority opinion. Once again, it comes to aid the Palmas, both crafting an argument on the Palmas' behalf—this time, that Officer Johns violated clearly established law—and then evaluating that argument. And, unsurprisingly, the majority opinion agrees with the argument it advocates. This approach is as disrespectful to the legal process as it is unprecedented. *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("Courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." (cleaned up)). *Gossman v. Allen* does not endorse these tactics, contrary to the majority opinion's suggestion. There, we resolved the clearly established inquiry (rather than reversing and remanding) because the district court misapplied the clearly established test "by using an overly abstract analysis," as the defendants argued on appeal. 950 F.2d 338, 341–42 (6th Cir. 1991). That is a far cry from this case, where the district court did not address the clearly established prong at all, and where the appellant did not raise the issue on appeal. *Cox v. Glanz* is no better. In *Cox*, the court "assum[ed] *arguendo*" that the defendant forfeited the clearly established prong before the district court, held that the plaintiff failed to show the defendant violated clearly established law, and granted qualified immunity. 800 F.3d 1231, 1244–47 (10th Cir. 2015).

In a situation like this, where the district court did not consider a potentially case-dispositive issue, the ordinary and more prudent practice is to remand the matter to the district court for further consideration. *See, e.g.*, *Haywood v. Hough*, 811 F. App'x 952, 962 (6th Cir. 2020) (remanding with instructions to determine if officer violated a clearly established right because the district court had not addressed the issue); *Jones*, 541 F. App'x at 662–63 (same). After all, "we are a court of review, not first view." *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015). And the majority opinion's decision to issue a published case declaring the clearly established law of our Circuit without prior consideration by the district court and full development of the record is, quite literally, a rush to judgment. *See Elonis v. United States*, 575 U.S. 723, 742 (2015) (explaining that "following [the] usual practice of awaiting a decision below and hearing from the parties would help ensure that [a court] decide[s] it correctly").

Were it appropriate for the clearly established inquiry to make its debut on appeal, Officer Johns's conduct did not violate clearly established law.  The Palmas effectively concede that there is no on-point, controlling case law prohibiting Officer Johns's conduct.  In their appellate briefing, the Palmas confessed that "there is no Sixth Circuit precedent directly on point with the facts of this case."  They likewise failed to cite to any on point Supreme Court decision.  Those concessions foreclose this manner of overcoming qualified immunity.  *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (to determine if a right was clearly established, "[w]e begin with, and could end with, the reality that [the plaintiff] points to no Supreme Court or Sixth Circuit case" that would have notified the officers that they violated a constitutional requirement).

In the absence of a controlling, on-point case, the Palmas are left to show that this is the rare, "obvious" case where the general excessive force standard articulated in *Graham* and *Garner* clearly established the law.  *See Rivas-Villegas*, 142 S. Ct. at 8.  But the Palmas essentially concede this argument too.  After all, they describe their case in their brief as one involving "factually nuanced questions," not obvious and blatant misconduct.  *Cf. Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (defining an obvious case as one where "no reasonable . . . officer could have concluded that" the defendants' behavior was constitutionally permissible); *Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (defining an obvious case as one with "obvious cruelty inherent in" the officers' conduct).  With the Palmas having failed to offer any manner of argument that Officer Johns violated any clearly established law, we must affirm the judgment of the district court.  *See Rivas-Villegas*, 142 S. Ct. at 8; *see also Thomas v. City of Columbus*, 854 F.3d 361, 364 (6th Cir. 2017) ("We 'may affirm a decision of the district court for any reason supported by the record, including on grounds different from those on which the district court relied.'" (quoting *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786 (6th Cir. 2016))).

That surely would be the result in most cases.  But not here, we learn.  Unwilling to accept the Palmas' concessions, the majority opinion takes it upon itself to show that Officer Johns violated clearly established law.  Setting aside the procedural oddities of the referees taking shots for one team, none of the majority opinion's cases clearly establishes that Officer

Johns's uses of force were unreasonable. Several of the majority opinion's cases were decided after the shooting, meaning that they "could not have given fair notice to [Officer Johns] and are of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam). *See Hood v. City of Columbus*, 827 F. App'x 464 (6th Cir. 2020); *Graves*, 810 F. App'x 414; *Wright*, 962 F.3d 852; *Jacobs*, 915 F.3d 1028; *Woodcock v. City of Bowling Green*, 679 F. App'x 419 (6th Cir. 2017). And all of the cases involved factually different circumstances. In some, the decedent, unlike Vincent, was walking or driving away from the officer at the time of the shooting. *See Jacobs*, 915 F.3d at 1033–34; *Godawa v. Byrd*, 798 F.3d 457, 461–62, 465–66 (6th Cir. 2015); *Zulock*, 441 F. App'x at 302; *Bouggess*, 482 F.3d at 887. In others, the decedent had not repeatedly approached the officer, defying the officer's orders to stop. *See Wright*, 962 F.3d at 866–67 (person sitting in his car had complied with several of the officers' orders but was unable to comply with the order to exit the vehicle due to his medical issues); *Woodcock*, 679 F. App'x at 424 (decedent stood 72 feet away and faced away from the officers); *Jones*, 541 F. App'x at 665 (decedent awoken by a flash bang device immediately before being shot); *Sova v. City of Pleasant*, 142 F.3d 898, 902–03 (6th Cir. 1998) (decedent stood in his kitchen). And with respect to the specific contention that Officer Johns violated clearly established law by shooting Vincent when he tried to stand up and continue toward Officer Johns, in the majority opinion's cases, unlike here, there either was a factual dispute as to whether the decedent still posed a threat to the officer when the officer shot, *see Hood*, 827 F. App'x at 471; *Margeson v. White County*, 579 F. App'x 466, 472 (6th Cir. 2014); *Russo*, 953 F.2d at 1040–41, or the case did not involve lethal force, *see Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006).

Particularly troubling, once again, is the majority opinion's continued reliance on Vincent's mental health status as grounds to deny qualified immunity. Simply put, the majority opinion identifies no case that would have put Officer Johns on notice that Vincent's unspecified mental health condition made his use of lethal force unconstitutional despite the threat of imminent harm that Vincent posed. *Graves* is not such a case—it was decided after the encounter between Officer Johns and Vincent and, at any event, involved a man with a mental illness who was trapped in a bathtub and "stationary, staring straight ahead, not making eye contact with anyone." 810 F. App'x at 423. Nor is *Gaddis*, where we held that an officer who

used nonlethal force against a person with a mental illness was entitled to summary judgment. 364 F.3d at 775.

No more compelling is the majority opinion's reliance on the general excessive force standard in *Graham*, *Garner*, and their progeny. To the majority opinion's mind, those decisions clearly established Vincent's right to be free from Officer Johns's uses of force. But that would be so, at most, only if this case were an "obvious" one, that is, where "no reasonable . . . officer could have concluded that" Officer Johns's use of force was constitutional. *Taylor*, 141 S. Ct. at 53; *see also Rivas-Villegas*, 142 S. Ct. at 8. As already explained, this is far from an obvious case. Indeed, two judges (myself and the district court) believe that no constitutional violation occurred whatsoever, let alone an obvious one. And even the majority opinion, in a more candid moment, acknowledges that this case merely "raise[s] a triable issue as to the reasonableness of [Officer] Johns'[s] decision to use lethal force," not an obvious violation of the Fourth Amendment. *Supra*, at 25.

Nor can one accept the majority opinion's formulations of the purported rights at issue. It does so in the following ways. One, that there is a clearly established right to be from "the gratuitous or excessive use of a taser." *Supra*, at 29 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015)). And two, "that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm.'" *Supra*, at 29 (quoting *Mullins*, 805 F.3d at 765). But that level of abstraction is far too general to articulate a "clearly established" Fourth Amendment right. I am not alone in that belief. As the Supreme Court has explained, the right is defined "too general[ly] if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was clearly established.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted). And formulating the right with "specificity is especially important in the Fourth Amendment context." *Mullenix*, 577 U.S. at 12. Turning a blind eye to the Supreme Court's statements in this area of law is risky business. Indeed, the Supreme Court routinely reverses lower courts for the exact error that the majority opinion makes. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (summarily reversing court of appeals for holding that the "right to be free of excessive force" was clearly established); *Mullenix*, 577 U.S. at 12 (same);

*see also Mullenix*, 577 U.S. at 14 ("The general principle that deadly force requires a sufficient threat hardly settles this matter."); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."). Simply put, a purported clearly established right to be free from excessive force is a far too general standard, a fact that even the majority opinion seems to understand. *See supra*, at 28–29 (noting that the "right to be free from excessive force" is "defined at . . . a high level of generality" but then claiming that the right to be free from "excessive use of a taser" and "not to be shot absent 'probable cause to believe that [the person] pose[s] a threat of serious physical harm'" are sufficiently particularized formulations of the right); *cf. Studdard*, 934 F.3d at 481 (describing the use of lethal force as excessive where the officer lacked "probable cause to believe the suspect presents an immediate threat of serious physical harm to the officer or others" (citing *Garner*, 471 U.S. at 11)).

To refute this straightforward conclusion, the majority opinion invokes our recent decision in *Gambrel*. But there, unlike here, the plaintiff "'identif[ied] a case' . . . with 'materially' indistinguishable facts." — F.4th —, 2022 WL 369348, at *7 (alteration in original) (citation omitted). That the majority opinion relies so squarely on a decision whose ink is barely dry further confirms its futility in identifying a right clearly established at the time of Vincent's shooting.

Otherwise, the majority opinion essentially duplicates its analysis as to whether a Fourth Amendment violation occurred when it addresses the separate clearly established prong. That approach, however, eviscerates the two-step qualified immunity inquiry. *See Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012). It deems a finding that an officer's use of force violated the Fourth Amendment (because he lacked probable cause to believe the person posed a sufficient threat) as tantamount to a finding that the officer violated a clearly established right. Here too, the majority opinion runs afoul of bedrock Supreme Court precedent, this time cases holding that resolution of step one does not automatically resolve step two. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) ("'[Whether] the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood

that he was violating it' . . . is a necessary part of the qualified-immunity standard . . . ." (citation omitted)); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[T]his Court [has] mandated a two-step sequence for resolving government officials' qualified immunity claims.").

The majority opinion, of course, has some company of its own. But it is not respectable company to keep. By my count, the Supreme Court has summarily reversed our sister circuits at least ten times in as many years for incorrectly analyzing the clearly established prong. *See Rivas-Villegas*, 142 S. Ct. 4; *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *Emmons*, 139 S. Ct. 500; *Kisela*, 138 S. Ct. 1148; *White*, 137 S. Ct. 548; *Mullenix*, 577 U.S. 7; *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam); *Carroll v. Carman*, 574 U.S. 13 (2014) (per curiam); *Stanton v. Sims*, 571 U.S. 3 (2013) (per curiam); *Ryburn v. Huff*, 565 U.S. 469 (2012) (per curiam). The majority opinion bears a striking resemblance to, among other cases, the decisions reversed in *Emmons*, *Kisela*, *White*, and *Mullenix*. In each instance, the Supreme Court reiterated the courts of appeals' error in failing to identify on-point, controlling precedent holding that the official's conduct was unconstitutional, and instead erroneously relying on the general statement that excessive force violates clearly established law. *See Emmons*, 139 S. Ct. at 503–04; *Kisela*, 138 S. Ct. at 1153; *White*, 137 S. Ct. at 552; *Mullenix*, 577 U.S. at 16–18. Regrettably, we have not learned from these past mistakes.

At day's end, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (citation omitted). Because the Palmas have not come close to satisfying that demanding standard, I would affirm the judgment of the district court.